No 2.—R. & J. CALDWELL & Co., plaintiffs in error, *vs.* ADAM B. DULIN, defendant in error.

[1.] D gave his notes with securities, in settlement of an account. Afterwards he filed a bill to open the settlement, alleging that if the balance was against him at all, it was not against him to an amount as large as the amount of the notes. *Held,* that he ought to have joined the sureties as *complainants* with him, unless they were unwilling to be so joined.

[2.] On a settlement between D. and C. & Co., the latter gave up to the former, certain securities of his, and received from him his notes signed by securities, for the balance, which C. & Co. claimed of him—he protesting that he was entitled to certain credits, which, as he alleged, had not been allowed to him, and declaring that he would set up those credits in defence to the notes. Afterwards suit was brought on the notes, and he filed a bill to enjoin the suit, and to open the settlement—in which bill he failed to make an offer to relieve the securities. *Held,* that such an offer was not necessary.

[3.] The statements of a bill must have, at least, such a degree of certainty, that if admitted to be true, some decree may be rendered upon them; or some excuse must be given for the want of this degree of certainty—as, that the unstated particulars are exclusively within the knowledge of the defendant.

Caldwell & Co. vs. Dulin.

In equity, from Spaulding Superior Court. Decision by Judge Green, May Term, 1856.

The bill alleges that the complainant, Adam B. Dulin, prior to the year 1850, was an extensive cotton buyer in the town of Griffin, and had the reputation of being a good judge of cotton, as well as a safe and prudent purchaser—well knowing when to enter the market, how much to buy, and at what prices it was safe to invest—and had been for many years in the habit of purchasing, annually, large quantities, and shipping the same to commission merchants in the cities of Savannah, Charleston and New York; and that he had made consignments to the firm of Robert and John Caldwell, commission merchants, in said city of Charleston, who were thus well acquainted with the business habits and successful operations of complainant; that after the year 1850, Winthrop B. Williams became a partner in the house of Caldwells, which after that time did business under the name of R. & J. Caldwell & Co.

The said firm of R. & J. Caldwell & Co., the defendants, in order to secure the profits arising from the sale, storage and commissions on the cotton bought by complainant, entered into an agreement to furnish any amount of monied facilities to him to buy cotton in the said city of Griffin, which " his prudent purchases of cotton at Griffin would require during the years from 1850 to the end of this business," and that he was to consign to said defendants all the cotton which he should purchase, and after deducting their commissions of $2\frac{1}{2}$ per cent. for selling and discharging, and paying off the amount advanced by them, the balance of the proceeds of sales was to go to the credit of, and belong to complainant. Afterwards, defendants established a branch of their business in the city of New York, and discounted a draft for complainant against a shipment of cotton made to the New York house, and gave to him a letter of credit to draw upon said house to the amount of $15,000, at from 60 to 90 days after

date or sight. With this facility complainant entered into the " cotton speculation contemplated by the contract," and agreed upon as aforesaid. Afterwards defendants gave to complainant authority to draw upon their house in New York for the further sum of $3,000, at from 60 to 90 days, against cotton shipped.

Under this agreement complainant consigned to defendants all the cotton he bought, as long as defendants performed their part of the contract. He shipped to the house in New York four hundred and eighty-three bales, on which defendants realized profits to the amount of twenty thousand dollars, or other large sum ; but defendants not only withheld advances, which, under said agreement, they were to make, but secretly and fraudulently furnished means to another party in Griffin to buy cotton, and misled complainant as to the propriety of continuing in the cotton speculation at the city of Griffin; and complainant, about the 8th of March, 1852, seeing that he could not buy in Griffin, more cotton, in a short time, than he was authorized by defendants to draw for, and most of the crop being sold and shipped, and having confidence in the market, and believing that a great advance in prices, would, in a short time, take place, proposed to defendants to furnish him facilities to make a special operation in the city of Savannah—the cotton to be shipped to their house in New York. This proposition defendants declined, unless ? bonus was deposited, or an indemnity given; and to indemnify defendants against liability or loss on account of the funds and facilities to be furnished him to buy cotton in Savannah, complainant executed and delivered to them a bill of sale of twelve negroes, worth $9,000, and which was absolute and to operate as a sale, only in the event of a loss to them on said speculation; and he gave his note to defendants payable five months after date, for the hire of the negroes thus sold—they undertaking to have said cotton operation closed within that time. A time was appointed at which defendants were to meet complainant in Savannah to buy

the cotton, or furnish him with the money or facilities for buying the same, to the amount of one thousand or fifteen hundred bales; but defendants failed and refused to carry out said agreement, withheld the facilities to by the cotton, and entered the market themselves, and made purchases secretly, by their agent; refused to accept the drafts drawn by complainant upon cotton shipped from Griffin, and concealed from him information in relation to the cotton market, and furnished information to others. That said 1500 bales of cotton could have been bought for the sum of fifty-one thousand dollars, and sold in the city of New York within the five months agreed upon, for the sum of seventy thousand dollars clear of all expence, and complainant thus realize nineteen thousand dollars; which he was prevented from doing by the fraud of defendants; and that prior to the year 1850, he gave to said R. & J. Caldwell a large number of blank signatures, to be used as occasion might require, and these were retained by defendants, J. & R. Caldwell & Co., to enable them to use complainant's name at pleasure in the proposed cotton operation in Savannah.

The bill further alleges that in the year 1851, complainant obtained from said defendants two thousand nine hundred dollars, to enable him to build and finish a steam saw-mill, in the county of Pike; and to secure this sum he procured his vendor of the land on which said mill was erected, (the same being 100 acres), to convey it to defendants; the said mills and land being worth $5,000.

That in September, 1852, defendants brought suit for the recovery of said slaves, sold and conveyed as aforesaid; by virtue of the process issued in said case, (it being *bail trover*), the slaves were seized and lodged in jail; that in order to relieve said negroes from their confinement in prison, where their health and lives were jeopardized, complainant gave his three notes, with Archibald A. Gaulding and Augustus Merritt as securities, for the whole amount claimed by said

defendants, to be due from him to them; said notes amounting, in the aggregate, to the sum of $5,827 44.

That at that time he did not know the full extent of the fraud which had been practiced upon him by defendants, or the state of the accounts as kept by them, and gave said notes, protesting that he did not owe said defendants, and that he had equitable setts-off which he would oppose to said notes; and at the same time gave to defendants other lands in place of the saw-mill premises.

The bill further alleges that since the giving of the said notes the complainant had discovered that the defendants had practiced a further fraud on him, other than the noncompliance with the aforesaid contracts; that in and for some years before the year 1850, complainant, at the request of R. & J. Caldwell, advanced money to William H. White and other persons, to ship cotton to said house, and by which consignments they realized commissions to the amout of five thousand dollars, or other large sum, and to a part of which commissions, by agreement, complainant was entitled; but they failed and neglected to pay complainant any part thereof, and have concealed from him the amount he ought to receive, and he has thereby sustained damage to the amount of twenty-five hundred dollars.

The bill further alleges that in 1846, complainant having a large amount of cotton on hand in Griffin, which would have made him a profit of $10,000, or other large sum, if he had not shipped the same until the railroad began to carry off cotton, and the railroad not being in use or running at the time, the house of the Caldwells proposed that if he would immediately send forward his cotton by wagons, and any loss was thereby sustained, that he should not be injured, but that they would furnish him with money at some favorable time to buy cotton, and hold the same for him until all losses should be made up by some one large purchase of cotton; complainant, under this promise, sent forward his cotton by wagons, and thereby sustained a loss of five thousand

dollars, and said Caldwells, when there was an opportunity to make up this loss, wholly neglected to furnish the facilities as promised, but always pretended at such a time to be hard run to raise money to hold cotton, and thereby, would put off the complainant from time to time, by promising the money at some future time. That said Caldwells practised further frauds by making sales of cotton for him, under pretence that they were unable to hold, and that fraudulent sales of cotton were made by them, for their benefit, and to the great damage of complainant, and losses charged to him, which did not, in reality, occur or exist; and that the defendants have applied the proceeds of the cotton shipped to them, to pay off the unjust and fraudulent charges made by Robert and John Caldwell against him prior to 1850.

The bill further alleges that these frauds and fraudulent concealments, have come to the knowledge of complainant since he gave his notes in 1852, and which were then unknown to him; that said defendants have realized twenty thousand dollars, or other large sum in commissions from the consignments and business of the complainant; and that they have, by their failure to perform their agreements, and by their frauds and fraudulent concealments, inflicted upon him losses and damages to the amount of twenty thousand dollars, and for which they should account. That defendants have commenced suit against complainant and his securities upon two of the notes which have become due, and are still the owners and holders of the other note, not yet due. That defendants reside out of the State, and have no property in the same, sufficient to satisfy the demands of complainant.

The bill prays for a settlement and account; that the action at law upon said notes be enjoined; that defendants be restrained from disposing of the note not yet due, until the adjustment of their accounts; for discovery, general relief, &c.

The bill was sanctioned and the injunction granted, at chambers, 21st October, 1855.

Defendants demurred to the bill for want of equity.

At the same time they filed their answer, admitting that complainant resided in Griffin at the time stated in the bill, and was a cotton buyer and shipper. That defendants, in their capacity as factors and commission merchants, received, at various times, consignments of cotton from him, but they deny that there was any such agreement as that set forth in the bill; nor did they agree, in any wise or manner, to furnish him facilities to pay for cotton he might purchase; nor did complainant bind himself to ship to them all the cotton he should purchase in Griffin; nor did they ever consider him so bound. That he did send to them of his own mere motion, and without their solicitation, a written paper, by which he agreed not to deal any more in cotton, unless recognized by them; that this paper, together with an *affidavit*, whereby he binds himself to abstain from the use of intoxicating liquors for a time therein specified, are the only obligatory instruments executed by complainant, now in their possession; and that from neither of these does the obligation alleged, appear, and they deny the truth of each and every allegation contained in the statements of said bill, and aver that the transactions between them were of the ordinary mercantile character. That complainant shipped to them such cottons as to him seemed advisable. That they, on the reception of the bills of lading, accepted the draft of complainant drawn on said shipment—on the arrival and delivery to them of the cotton, they exercised their best judgment as to the sale of it, and endeavored, in every instance, to the best of their ability, to faithfully perform the duties of skillful and prudent factors. That, when the cotton was sold, the proceeds were applied to the liquidation of the draft drawn on said cotton, and the residue paid over to complainant.

The answer further admits that, in 1852, defendants es-

Caldwell & Co. vs. Dulin.

tablished a branch of their house in New York, and discounted a draft drawn by complainant against a shipment of cotton made to said house, and did give him the two letters of credit mentioned in the bill, but they deny that said letters of credit were given in pursuance of any agreement, as set forth in said bill, but that the transaction was the ordinary mercantile arrangement, by which consignors of limited means and restricted credit, are facilitated in negotiating drafts drawn on shipments of produce; that complainant did ship the cotton mentioned in his bill to the New York house, they admit, but they aver that said shipments were sold for him, and on his account, and account of sales and proceeds thereof, received by him, and the transaction, long since closed and settled, and that they received nothing therefrom, but their legal commissions of two and a half per cent. They deny that they ever entered into any agreement to make advances, and that they were at all times at perfect liberty, unrestricted by any contract, to do business when, where, and with whom they pleased; and deny all the charges of the bill as to giving false reports, or concealing information, and as to any and all false charges and fraudulent practices.

They deny that they ever agreed to furnish complainant with money or facilities to embark in a cotton speculation in Savannah, or entertained said proposal, or agreed, in any way, or upon any terms, to be connected with it; and they declare the entire statement respecting their demand for indemnity to be wholly untrue. That the bill of sale of the negroes mentioned in said bill, was executed to secure the payment of three promisory notes, given by complainant to defendant, for debts due by him, arising out of transactions prior to those set forth in his said bill; one note for the sum of $4,183 62, due 1st January, 1852; one for $4,476 46, due 1st January, 1853; and one for $5,703 11, due 1st January, 1855; and they deny that said bill of sale was executed as

an indemnity to them against any loss arising from the cotton speculation projected by complainant.

The answer admits that defendants did hold sundry blank notes signed by the complainant, that some were filled up and used for the benefit of complainant; that they were rendered available solely by their endorsements, and they were protected by them, being regularly taken up when due, and the money arising from the discounting thereof, was credited to complainant, and accounts rendered to him, and no objections were made thereto until the filing of this bill.

That apprehending that the negroes before alluded to would be removed by complainant, defendants instituted their suit and had said slaves lodged in jail, to be forthcoming on the recovery of judgment, and thereupon complainant entered into an arrangement by which the three notes above mentioned were cancelled, the negroes released and restored to complainant, and the title to the saw-mill premises given up, and in lieu of the securities so relinquished, defendants accepted of complainant his three notes with Gaulding and Merritt as securities, amounting in the aggregate to $5,827 44, and also accepted titles to other premises in lieu of those on which the mill was erected; and this settlement was affected by defendants giving up more than half their claim, and taking less than 50 cents in the dollar, as will appear by a comparison of the notes and titles relinquished and received.

They deny that there is any thing due complainant as his proportion of commissions on shipments made to them by William H. White, or that they ever authorized complainant to make any advances to White on their behalf; and they deny the statement of complainant in reference to his sending forward his cotton by wagon, in 1846, when transportation by railroad was interrupted, at their instance, or by their authority, and declare every matter and thing in said allegation to be utterly false; they deny all fraudulent sales of cotton, or that they ever realized from sales of the same, any thing more than their regular and legal commissions; they

Caldwell & Co. vs. Dulin.

deny that they owe complainant any thing, and admit that they have instituted suit on said notes as stated in the bill, being forced thereto as the only means of recovering their debt from complainant.

Upon the coming in of the answer and hearing the demurrer, and after argument by counsel, upon the motion to dissolve the injunction and dismiss the bill, the Court overruled the demurrer and refused the motion to dissolve, whereupon counsel for defendants excepted to said judgment and decision on the following grounds.

1st. Because there was no equity in the bill.

2d. Because Merritt and Gaulding being interested in the decree sought by the bill, and enjoying the benefits of the injunction are necessary parties thereto.

3d. Because the bill seeks the recission of a contract without, in any manner, reinstating the defendants in the condition they were before the execution of the contract.

4th. Because the allegations in the bill are too loose, uncertain and defective—admitting the same to be true—to justify any decree in favor of complainant.

5th. Because the defendants had filed their answer fully denying all the equities in the bill, if there were any.

Stark, for plaintiffs in error.

Alford & Hammond, for defendant in error.

*By the Court.*—Benning, J. delivering the opinion.

Was the Court right in overruling the demurrer?

The demurrer was founded upon an allegation that there was no equity in the bill.

And in support of this allegation, certain reasons are stated in the bill of exceptions. Of these the first is, that Dulin's sureties on the notes are not parties to the bill.

It was argued that, as the sureties were not parties to the bill, the decree would not bind them, and, therefore, that if the decree should be in favor of the defendants, they would, nevertheless, be exposed to the risk of another suit like the present, at the instance of the sureties.

This argument is sufficient to show that the sureties would be proper parties *complainant* to the bill; but it is not sufficient to show that they would be proper parties defendant to the bill. This must be manifest.

But they are not *necessary* as parties complainant; a decree can be rendered without them; and if it could not be, yet they cannot be made parties complainant against their will; no person can be made a suitor against his own will.

[1.] It follows that their absence as parties from the bill, could not be that which would show that there was no equity in the bill. Still the complainant ought to add them to the bill as co-complainants, unless they object to his doing so. The want, however, of even necessary parties to a bill, is not a cause for dismissing it, if such parties are to be had by a mere amendment.

The next reason stated in the bill of exceptions is, that the bill of complaint contains no offer to restore things to the state in which they were before the settlement was made.

But the settlement was made, the negroes delivered up, and the notes taken as security, in lieu of the negroes, in the face of a protest made by the complainant that he did not owe the defendants any thing, and that he would defend himself from the notes, by setting up cross demands against them; that is to say, would defend himself in the way in which he is now attempting to defend himself. It was in the face of this protest, that the defendants took the notes in lieu of the negroes; and doubtless, they did so, for sufficient reasons that were known to themselves. It is to be presumed, therefore, that if an offer had been made by the complainant to the defendants, to restore things to their old con-

Caldwell & Co. vs. Dulin.

dition, the offer would have been rejected. And *lex nemi-nem cogit ad vana, seu inutilia.*

Besides, it is questionable whether the maxim—one must do equity before he asks equity—would, even if this protest were not in the case, require more of the complainant, than an offer to let a decree go against him, should it turn out that the equity of the case would require a decree against him; as no decree can, in general, be rendered against a complainant, unless he has consented that one may be.

[2.] We think, then, that this reason was not a sufficient reason.

The next reason stated in the bill of exceptions, is, that the allegations in the bill are too uncertain. And this, surely, is a well founded reason as to most of those allegations.

The object the complainant wished to accomplish by the bill, was, as he states it, to open a settlement made by him with the defendants, and, in a new settlement, to get the allowance to him of certain demands of his against the defendants, which, he seems to mean to say, were not allowed to him in the old settlement. Of course, therefore, it was necessary that his bill should state those demands, with at least such a degree of certainty, that, if found true, they might serve as the basis of some decree.

The first of those demands, is that which, according to the bill, grew out of a contract, between him and the defendants, that was to be executed on his part at Griffin.

As to this contract, what the bill says, is, substantially, as follows : That the defendants were to supply the complainant with any amount of " monied facilities," which his " prudent purchases" of cotton, at Griffin, might require, and were to do so for an indefinite length of time—viz: from 1850, till the " end of this business ;" and he was to consign the cotton to them, and they were to sell it, take their advances and commissions out of the proceeds of the sales, and turn over the balance to him ; that they failed to make advances to him, except to the extent of $18,000, and, instead

of doing so, made advances to "another party in Griffin," and did so in secrecy; that they misled him as to the propriety of continuing " in the cotton speculation;" that, about the 8th of March, 1852, he, perceiving that he could not buy in Griffin, more cotton, in a short time, than he was authorized by the defendants to draw for, most of the cotton crop there, having been sold and "shipped," and he, "having confidence in the market," proposed to the defendants, that he should be allowed to make a special operation in Savannah; and that they, on certain terms, accepted the proposition.

This is all that the bill says descriptive of the Griffin contract. The breach of that contract, complained of, is the failure of the defendants to make to him as large advances as the contract called for, and yet, there is no statement of what the damages were that resulted from that breach, nor any statement of any matters which might serve as a measure of what such damages were : as the prices of cotton in Griffin and in Charleston, respectively, at the times when, (if the advances had been made,) the cotton would or might have been bought by the complainant at the one place, and would, or might have been sold by the defendants, at the other place. Indeed, there is an adminission which seems to neutralize the very allegation, that there was a *breach*, and therefore, of course, seems to show, that there could have been no damages—viz : the admission, that there was not in Griffin more cotton to be bought than what the complainant had authority to draw for, and that he, therefore, was induced to make a new proposition to the defendants.

Suppose all this were admitted to be true by the defendants, of what value would it be to the Court and jury, in making up a decree ? None. It is impossible to tell from it, *how much* damages the complainant even claims.

No excuse is given for this defect in certainty; it is not said that the facts are in the knowledge of the defendants, exclusively, and that a discovery from the defendants would

enable the plaintiff to state the facts with the requisite fullness and particularity.

[3.] So far, then, as the Griffin contract is concerned, it is true, we think, that the statements of the bill are too uncertain.

This contract labors under another objection, one, however, which was not urged before this Court, or the Court below, and, therefore, one, the sufficiency of which, this Court does not decide.   That objection is, that the damages, if any, which resulted from the breach of the contract, if there was a breach of the contract, must have consisted merely in a loss of *profits*—viz: in the loss of the profits which the plaintiff *would* have made if the defendants had complied with their part of the contract, that is, had furnished the plaintiff with means with which to " speculate" in cotton, for an indefinite length of time.

The next mentioned demand is one which the bill says grew out of a contract to be performed at Savannah—a contract that was to take the place of the contract just considered.

What has been said of the contract just considered, in respect to its want of certainty, may, for the most part, *mutatis mutandis*, be said of the contract now under consideration. The bill neither states the prices of cotton prevailing in Savannah, during the plaintiff's buying time, nor the prices of cotton prevailing in New York, during the defendants' selling time.

The plaintiff was to be at liberty to purchase from 1000 to 1500 bales of cotton.   *How many* he *would* have purchased if he had been supplied with money by the defendants, is not stated, if, indeed, such a thing could have been stated.

No excuse is rendered for the failure to state these facts.

The damages consist merely in the loss of supposed profits. The allegations, then, in respect to this contract, are also too uncertain.

Another of the demands is one which, according to the

bill, grew out of the fact, that the plaintiff, at the instance of the defendants, sent to them a quantity of cotton by wagons, instead of keeping the cotton until the railroad resumed operations, and sending it by the railroad.

What is true of the two contracts above mentioned, is *mutatis mutandis*, for the most part, in a greater degree, if possible, true of this.

Further, the bill sets up demands in favor of the plaintiff against the defendants, on the score of frauds practiced on him by them, in selling his cotton under the pretence that they were unable to hold it longer; on the score of losses charged to him, which did not, in reality, exist; on the score of a fraudulent misapplication of the proceeds of the sales of his cotton.

The allegations in respect to all of these demands, are too uncertain. It would be a waste of time to specify the particulars, in which the want of certainty consists.

There remains for notice, but one other demand, and that, we think, not however, without much difficulty, is set forth with a sufficient degree of certainty. That demand is the one founded, according to the bill, on advances made to White and others, at the request of the defendants. In respect to this demand, the bill says that the plaintiff, at the request of the defendants, advanced money to White and others, to be laid out in cotton, which was to be shipped to the defendants and to be sold by them; that the commissions on the sales were to be divided between the plaintiff and the defendants; and that the commissions on the sales amounted to $5,000. There is, perhaps, enough of certainty in this statement to found some decree upon.

To this demand, however, two other objections were made: first, that it was barred by the statute of limitations; secondly, that it was a demand existing, not against the defendants by themselves, but against them and one Williams, jointly.

As to the first of these objections—the demand is one founded on an account which was between merchant and

Caldwell & Co. vs. Dulin.

merchant, and which concerned the trade of merchandise. Such an account is expressly excepted from the operation of the statute of limitations.

As to the second—the *bill*, it is true, says, that Williams was not a member of the firm when this demand arose; but the *answer*, in its title, shows that he was. And the mistake in the bill may be corrected at any time. There can be little harm, therefore, in assuming that the correction will be made. At all events, we think that this objection is not such a one as to require the bill to be dismissed at present.

So much for the grounds of the demurrer, resting in the want of certainty in the allegations of the bill.

The reasons given by the bill, as the reasons why the demands set up in the bill were not brought into the settlement that was made, are far from satisfactory. There is, however, I think, saving efficacy in one of those reasons : the defendant says that he entered into the settlement, protesting that he did not owe anything, and that he had " equitable sets-off," which he should oppose to the notes that he was giving. This, as I conceive, made the settlement amount to no settlement at all.

There is but one exception left. The defendants insisted that their answer had sworn off all the equity of the bill The Court below held that it had not, and refused to dissolve the injunction.

This decision will not be disturbed. The answer is not full as to the allegations respecting the demand founded on the advance to White and others, nor as to those respecting the settlement. Besides, it seems itself suspiciously fond of dwelling in generalities.

The result is, that all the judgments of the Court below, must remain undisturbed.

Judgment affirmed.