**NATIONAL INDEPENDENT THEATRE EXHIBITORS, INC., et al., Plaintiffs-Appellants,**

v.

**CHARTER FINANCIAL GROUP, INC., etc., et al., Defendants-Appellees.**

**No. 82–8669.**

United States Court of Appeals, Eleventh Circuit.

Dec. 5, 1984.

Rehearing and Rehearing En Banc Denied Feb. 5, 1985.

1398

James Thomas Patterson, Sr., pro se.

Lawrence L. Aiken, Riverdale, Ga., for Nat. Independent Theatre Exhibitors.

Sutherland, Asbill & Brennan, Alfred A. Lindseth, Thomas A. Varlan, Atlanta, Ga., for Charter.

Troutman, Sanders, Lockerman & Ashmore, Jeffrey R. Nickerson, June Ann Kirkland, Atlanta, Ga., for Columbia.

Before TJOFLAT and HATCHETT, Circuit Judges, and GARZA *, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

This suit arises out of a dispute over the right to distribute a motion picture, "The Buddy Holly Story," for exhibition in theatres across the United States. James Thomas Patterson, Sr. and National Independent Theatre Exhibitors, Inc. (NITE) claim that they had a contract right, given them by Charter Financial Group, Inc. (Charter), one· of the film's co-executive producers, to distribute the film· and that Charter and Columbia Picture Industries, Inc. (Columbia) wrongfully deprived them of that right when Charter made Columbia the exclusive distributor of the film.

Patterson and NITE sued Charter and Columbia in the district court in three counts, each seeking money damages on a discrete theory of liability. First, plaintiffs, invoking section 4 of the Clayton Act, 15 U.S.C. § 15 (1982),[1] claimed that the defendants' conduct violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1982), and that they were entitled to treble damages. Second, plaintiffs claimed that Charter's breach of its distribution contract with them rendered Charter liable for the revenues they would have obtained had they distributed the film. Third, plaintiffs claimed that Columbia had tortiously interfered with their contract with Charter and thus was also liable for the same lost revenues.[2] The defendants denied the alleged wrongdoing. Charter also counterclaimed, alleging that the plaintiffs fraudulently induced it to enter into any distribution contract it may have made with them and that it had suffered consequential damages as a result.

The case was tried to a jury. At the close of the plaintiffs' case, the court directed a verdict for Columbia and dismissed it from the case. At the close of all the evidence, the court directed a verdict for Charter on plaintiffs' antitrust claims. It submitted plaintiffs' breach of contract claim to the jury, and the jury found for Charter.

Patterson and NITE appeal. Patterson contends that the district court erred in taking his antitrust[3] and tort claims from the jury and that the court committed reversible error in charging the jury on his

---

* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Jurisdiction for plaintiffs' antitrust claims was predicated on 28 U.S.C. §§ 1331 and 1337 (1982). Jurisdiction for plaintiffs' breach of contract and tortious interference with contract claims was based on 28 U.S.C. § 1332 (1982) and the district court's pendent jurisdiction.

2. In their *ad damnum* clause at the end of their complaint, plaintiffs prayed for $20 million in punitive damages, presumably as to each of their three claims for relief. Charter's counterclaim also sought punitive damages, in the sum of $100,000.

3. The court summarily dismissed Patterson's antitrust claims on the defendants' motions prior to trial. It directed a verdict for Columbia on Patterson's tortious interference with contract claim at trial, at the close of plaintiffs' case. *See infra* text at 1400.

breach of contract claim against Charter. NITE does not challenge the district court's direction of verdicts; it takes issue only with the court's handling of its breach of contract claim against Charter. We find no reversible error in this case and accordingly affirm.

## I.

Charter is an investment brokerage company operating out of Houston, Texas. It serves as an intermediary in the financing of business ventures. Its clients include entrepreneurs who are in need of venture capital and individual investors who possess such capital. Charter's involvement in the distribution of "The Buddy Holly Story" was its first experience in a motion picture venture.

In 1976, Ed Cohen, Fred Bauer and Steve Rush (the "Owners") acquired the movie rights to the life of Buddy Holly, a famous rock star musician of the 1950's. They lacked the resources to produce and distribute a movie and entered into a formal contract with Charter to fund the production and distribution of "The Buddy Holly Story." The contract provided that Charter would solicit $2 million in investment capital and form a limited partnership consisting of the Owners, who would contribute their film rights, and individual investors. The limited partnership would, in turn, contract with the Owners and Charter, as co-executive producers, to produce the film. In addition to being a co-executive producer, Charter would distribute the film, alone or through a major film distributor, to the exhibiting theatres across the country.

In the summer of 1976, after Charter contracted with the Owners, its vice president, Fred Kuehnert, contacted Patterson, who was president of NITE, about the possibility of NITE's distributing "The Buddy Holly Story." NITE was an association of independently owned theatre operators who, collectively, possessed some 5,000 theatre screens. NITE's board of directors had recently decided to distribute high quality films in competition with the major film distributors, such as Columbia, and was looking for a first run film to kick off its distribution program. Patterson convinced Kuehnert that NITE could do as good a job as the major distributors in obtaining theatre exhibitors to show the movie. He also impressed Kuehnert with his representation that, in advance of the film's distribution, NITE would obtain binding commitments from the exhibitors for minimum film rentals which Charter, in turn, could use to entice investors [4] to underwrite the film's production costs.

After a series of negotiations, Patterson and Kuehnert, on April 11, 1977 in Atlanta, Georgia, orally agreed on the following terms to be incorporated into a written exclusive distribution agreement between NITE and Charter.[5] NITE would get 750 of its member theatres to sign exhibition contracts with Charter obligating the theatre to rent "The Buddy Holly Story" for a specified period at a guaranteed minimum rent. Patterson told Kuehnert that it would take NITE about two months to solicit these exhibitors, so they agreed that NITE would have 120 days thereafter to place the exhibitors under contract. Charter, in return, would pay NITE $50,000 and would underwrite certain of NITE's solicitation expenditures. After the movie was

---

**4.** Patterson told Kuehnert that he could get at least 750 of NITE's members to guarantee a minimum rental. He estimated that each guarantee would average about $2,000 and that, collectively, they would approximate $2 million. Presumably, these guarantees would inure to the benefit of Charter's investors, serving indirectly to underwrite their provision of production costs.

**5.** It is undisputed that these negotiators contemplated a written contract between Charter and NITE. Each party had retained counsel who were to reduce the negotiators' understanding to writing. Charter's lawyer advised Charter not to accept the negotiators' proposal, and Charter followed that advice. NITE had no experience in distributing motion pictures, and the exhibitors' commitments would be worthless. To enforce those commitments, Charter would have had to sue the exhibitors in their jurisdictions, and considering the individual exhibitors' limited exposure, the litigation expenses would have been prohibitive.

produced and ready for distribution, Charter would deliver it to the NITE members who had contracted to exhibit it, collect the film rentals, and pay NITE twenty percent of these rentals.

Charter's obligation to distribute "The Buddy Holly Story" through NITE was contingent upon its acquisition of investment capital sufficient to produce the movie. Once Patterson and Kuehnert came to the understanding we have described, Charter set about the task of raising that capital. It soon found a group of investors in Boston, Massachusetts (the "Boston Group") willing to provide the necessary capital provided they could borrow it. The Boston Group contacted First National Bank of Boston, which had considerable experience in financing film production costs, and were advised that the investment Charter proposed was a poor risk. The bank based its judgment in large part on NITE's lack of experience in distributing first run films and the perceived worthlessness of NITE's exhibitor members' guarantees.[6] It advised the Boston Group that their investment would be much less risky, and thus capable of being bank financed, if they could obtain a major film distributor, such as Columbia, or a circuit exhibitor, such as General Cinema Corporation of America (which operated 850 screens across the country), to market the film and underwrite a portion of the production costs.

The Boston Group promptly communicated this information to Kuehnert at Charter and told Kuehnert that they would not go along with his NITE proposal. Kuehnert consequently looked elsewhere, and Charter eventually contracted with Columbia to distribute the film.

The production of "The Buddy Holly Story" was completed in February 1978, and Columbia immediately solicited exhibition bids from theatre operators, including NITE's members. When Patterson learned of this solicitation, he contacted Columbia's attorneys claiming that NITE had the exclusive right to distribute the movie and that it would sue Columbia if Columbia continued its distribution effort. Columbia ignored Patterson's threat and distributed the film. This litigation followed.

Patterson and NITE filed their complaint, in the three counts we have described *supra*, on December 1, 1978. After Columbia and Charter responded, the parties engaged in several months of discovery. When discovery was about concluded, the plaintiffs moved the court for leave to amend their complaint to add numerous parties, including the Owners, the Boston Group, and General Cinema Corporation of America, as defendants in their antitrust and tortious interference of contract counts. The court denied their motion because the plaintiffs had long known of these parties, and to allow plaintiffs to join them as discovery was coming to a close would "unduly prejudice [Columbia and Charter] and unnecessarily delay trial of the action."

Columbia and Charter thereafter moved for summary judgment on all counts. The district court denied their motions, except as to Patterson's antitrust claims. As to those claims the court concluded that Patterson had no standing to bring them because he was merely an employee of NITE. Following this ruling, the case proceeded to trial.

At the close of the plaintiffs' case, the court directed a verdict for Columbia on all issues. In making its ruling, the court assumed that Charter had given NITE the exclusive right to distribute "The Buddy Holly Story" and had denied it that right by substituting Columbia as the film's distributor. The court rejected NITE's antitrust claims against Columbia on the ground that it was not a violation of the Sherman Act for a manufacturer or supplier, like Charter, unilaterally to cancel an exclusive distributorship with one party, such as NITE, and to substitute another, such as Columbia. *Monsanto Co. v. Spray-Rite Service Co.*, —— U.S. ——, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984);

---

**6.** *See supra* note 5.

*United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). The court rejected Patterson's and NITE's tortious interference of contract claim against Columbia because there was no evidence indicating that Columbia, when it contracted with Charter, either had knowledge of an extant Charter-NITE distributorship agreement or caused its breach.

At the close of all the evidence, the court directed a verdict for Charter on the balance of the antitrust claims. Addressing NITE's section 1 Sherman Act claim, the court found no evidence of a conspiracy between Charter and a third party. As for NITE's section 2 claim, the court followed its reasoning in dismissing Columbia from the case. It also observed that Charter, having no presence in the film production and distribution industries, did not create a monopoly, attempt to create a monopoly, or restrain trade in the relevant product market. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

The district court denied Charter's motion for a directed verdict on plaintiffs' breach of contract claim, although the court seriously doubted that Charter and NITE and/or Patterson had ever reached a binding agreement to distribute "The Buddy Holly Story." The court also denied the plaintiffs' motions for a directed verdict on Charter's counterclaim. The jury thereafter returned defense verdicts on those respective claims.

## II.

As we have indicated *supra,* NITE does not appeal the district court's dismissal of its antitrust claims. Patterson, however, questions the court's ruling that he lacked standing to prosecute those claims individually. We dispose of his point in subpart A below.

Both plaintiffs challenge the court's instructions to the jury on their breach of contract claim against Charter. We reject their challenge in subpart B. Plaintiffs also claim reversible error in the court's denial of their pretrial motion for leave to amend their complaint and the manner in which it conducted the trial. Only the former claim of error is worthy of discussion, in subpart C; the remaining claims are frivolous and receive no further comment.

## A.

■ Standing to prosecute a private antitrust action under section 4 of the Clayton Act requires that the plaintiff prove that "he is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1131 (5th Cir.1975). *See Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.,* 710 F.2d 752, 762 (11th Cir.1983). The plaintiff must be the target against which anticompetitive activity is directed. *Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 710 (11th Cir.1984); *Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 546–47 (5th Cir.1980), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981). The injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). "Incidental or consequential injury or injury remotely caused by an antitrust violation does not give a plaintiff standing to complain that he has been injured by reason of anything forbidden in the antitrust laws." *Midwestern Waffles,* 734 F.2d at 710–11. *See Jeffrey,* 518 F.2d at 1131 (citing cases).

■ The film distribution market was the target of the defendants' alleged anticompetitive behavior. Patterson never intended or prepared to enter this business. There is no evidence that any of the defendants' alleged behavior was directed against him individually. Patterson clearly fell outside the target area. Accordingly, the district court correctly determined that he lacked standing to sue.

■ Patterson claimed individual injury in his capacity as an officer of NITE and the manager of its film distribution program, a target of the alleged conspiracy. The law on standing in this situation is clear. Neither an officer nor an employee of a corporation has standing to bring an action in his own right for an antitrust violation causing injury to the corporation and its business. *Midwestern Waffles,* 734 F.2d at 710–11; *Pitchford v. Pepi, Inc.,* 531 F.2d 92, 97–98 (3d Cir.1975), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *Jeffrey,* 518 F.2d at 1131. To be sure, such persons may suffer "indirect" or "secondary" financial injury from antitrust violations, but the law does not consider them to be the target of the anticompetitive practices. *Jeffrey,* 518 F.2d at 1131.

■ In addition, we are certain that any error concerning Patterson's standing to prosecute the antitrust claims was harmless. Patterson only contends that he should have been treated as a distributor in the same position as NITE. Had the district court allowed his case to proceed to trial, his evidence would have been the same as NITE's. That evidence, considered in the light most favorable to Patterson, would have established nothing more than it established for NITE, a unilateral refusal by Charter to deal with Patterson and NITE. Section 1 of the Sherman Act does not proscribe independent action. A manufacturer generally has a right to deal, or refuse to deal, with whomever it chooses so long as its decision is made independently. *Monsanto Co. v. Spray-Rite Service Corp.,* — U.S. at —, 104 S.Ct. at 1469 (1984); *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.,* 710 F.2d 752, 772–73 (11th Cir. 1983).

■ Section 2 of the Act prohibits monopolization and attempts to monopolize. A plaintiff need not demonstrate that the monopolization or attempt was the product of concerted action. Therefore, a wholly unilateral refusal to deal, when accompa-nied by the intent to monopolize and the requisite degree of market power, may constitute a violation of section 2. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 377–78, 93 S.Ct. 1022, 1029–30, 35 L.Ed.2d 359 (1973); *see also Lorain Journal Co. v. United States,* 342 U.S. 143, 152–55; 72 S.Ct. 181, 186–87, 96 L.Ed. 162 (1951). Charter's actions cannot be viewed as a predatory refusal to deal as proscribed by section 2, however, because the company plainly lacked sufficient market power to present a dangerous probability of success. *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.,* 382 U.S. 172, 177–78, 86 S.Ct. 347, 350–51, 15 L.Ed.2d 247 (1965); *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development Corp.,* 711 F.2d 989, 997 (11th Cir.1983). In sum, even if Patterson had standing, he could not have made out a claim under either section of the Sherman Act, and the district court would have been required to take his case from the jury, as it did NITE's.

### B.

According to NITE and Patterson, the district court, in charging the jury on their breach of contract claim against Charter, improperly instructed the jury on propositions of law about which there was no evidence. *See Collins v. Metropolitan Life Insurance Co., Inc.,* 729 F.2d 1402, 1405 (11th Cir.1984). They also contend that the court's charge contained such inflammatory language as to prejudice the jury against them.

■ In reviewing jury instructions, we consider the court's charge as a whole. When the instructions, taken together, accurately express the law applicable to the case without confusing or prejudicing the jury, there is no reason for reversal even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism. *Somer v. Johnson,* 704 F.2d 1473, 1477–78 (11th Cir.1983); *Johnson v. Bryant,* 671 F.2d 1276, 1280 (11th Cir.1982). An erroneous instruction does not require reversal unless the review-

ing court is "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1372 (5th Cir.1981).

The bulk of appellants' criticisms deal with the court's treatment of Charter's statute of frauds defense. *See* Ga.Code § 13–5–30(5) (1982). Charter contended that the oral agreement plaintiffs alleged it made in Atlanta on April 11, 1977, *see supra* Part I, was unenforceable because it was "not to be performed within one year." [7]

■ The law in Georgia, although not recently articulated, appears to be that the statute of frauds does not bar enforcement of an oral contract if one side is capable of completing his performance within one year. *Johnson v. Watson*, 1 Ga. 348 (1846).[8] The court properly instructed the jury on the statute, and, before the jury retired, plaintiffs objected to the instruction, contending that the evidence failed to support Charter's statute of frauds defense. *See* Fed.R.Civ.P. 51. They argued that the evidence conclusively established that they could have performed their part of the bargain within one year and that the court's submission of Charter's defense to the jury caused them substantial prejudice. We are not persuaded.

The evidence in this case, viewed most favorably for the plaintiffs, indicated that no contract of any kind existed between Charter and Patterson. At all times, Patterson was acting as NITE's representative; hence the court should have withdrawn his claim from the jury when Charter moved for a directed verdict. It follows, then, that the court's charge on the breach of contract claim caused Patterson no prejudice.

■ There is little, if any, possibility that the charge prejudiced NITE either. There was a remote chance, at best, that NITE could have performed the April 11, 1977 oral contract within one year. First, NITE needed at least two months, at minimum, to prepare itself to publicize its distribution of "The Buddy Holly Story"; thereafter, it needed four more months to sign up the 750 exhibitors it promised Charter it would obtain. Production of the film was not to commence for several months; in all, the parties contemplated that practically a year would pass before the film reached NITE's exhibitors. Finally, NITE was required to monitor its exhibitors' performance throughout the film's exhibition. On this record, we would be hard pressed to reverse the district court had it directed a verdict for Charter on this claim.

Having declined to direct a verdict, the district court was manifestly required to submit Charter's statute of frauds defense to the jury. The court's instruction carefully tracked the statute and, in our view, was entirely free of error. The plaintiffs have no room for complaint, and we accordingly reject their challenges to the manner

---

7. The Georgia Statute of Frauds, codified as Ga.Code § 13–5–30 (1982), provides in relevant part:

> **13–5–30. Agreements required to be in writing.**
> To make the following obligations binding on the promisor, the promise must be in writing and signed by the party to be charged therewith or some person lawfully authorized by him:
> . . . .
> (5) Any agreement that is not to be performed within one year from the making thereof; . . . .

8. It is clear that, under Georgia law, if *both* parties to a contract are capable of performing within one year, the contract is outside the statute of frauds. *Henderson v. Touchstone*, 22 Ga. 14 (1857); *Weems v. Assoc. Life Ins. Co.*, 154 Ga.App. 552, 269 S.E.2d 57, 59 (1980); *Klag v. Home Insurance Co.*, 116 Ga.App. 678, 158 S.E.2d 444, 451 (1967). These cases should not necessarily be read, however, as *requiring* that *both* parties be capable of performing within a year in order for the contract to be outside the statute of frauds; thus they need not be read as overturning the holding in *Johnson v. Watson*, 1 Ga. 348 (1846). If, however, Georgia law does require that both parties be capable of performing within one year in order for the contract to be outside the statute of frauds, the contract before us clearly could not have met this more stringent requirement. For, as we demonstrate *infra*, it would have been nearly impossible for even one of the parties, NITE, to have performed within one year.

in which the court submitted their breach of contract claim to the jury.

### C.

 NITE and Patterson contend that the district court erred in not granting them leave to amend their complaint to add fourteen new defendants, including the Owners, the Boston Group, and General Cinema Corporation of America, and to increase their prayer for punitive damages from $20 million to $150 million. The plaintiffs made their request after almost a year of extensive discovery. During the interval, thirty-three people were deposed and the parties propounded numerous interrogatories and produced substantial quantities of documents. Discovery was about concluded, and the defendants were preparing to go to trial.

The grant of leave to amend is committed to the district court's discretion, but Fed.R.Civ.P. 15(a) provides that "leave shall be freely given when justice so requires." *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Espey v. Wainwright,* 734 F.2d 748, 750 (11th Cir.1984). In this case, the district court correctly applied the standard enunciated in *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

Here, the plaintiffs unnecessarily delayed the prosecution of their claims against the fourteen additional parties. Charter and Columbia, both ready for trial, would have been prejudiced by the delay and expense occasioned by the largely repetitious discovery the new defendants would have required. Finally, the plaintiffs, in moving for leave to amend, made no showing in their factual allegations as to how the additional parties could be held liable on any of the claims they were asserting against Charter and Columbia. Under these circumstances, the district court acted within its discretion in denying plaintiffs' motion for leave to amend the complaint. The judgment of the district court is

AFFIRMED.