**Mayme FOSTER, guardian ad litem of Oscar Foster, an incompetent, Appellee,**

v.

**CRAWFORD SHIPPING CO., LTD., Appellant.**

**No. 73–1600.**

United States Court of Appeals, Third Circuit.

Argued March 11, 1974.

Decided April 30, 1974.

Frank C. Bender, Kelly, Dessey & Scanlan, Philadelphia, Pa., for appellant.

Marvin I. Barish, Freedman, Borowsky & Lorry, Philadelphia, Pa., for appellee.

Before ALDISERT, GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from an order of the district court denying the motion of defendant Crawford Shipping Company for a new trial on damages only. The

original plaintiff, Oscar Foster, brought an action to recover damages for his personal injuries suffered in an accident while, as a longshoreman, he was unloading defendant's vessel. On September 28, 1972, four days before the trial began, his attorneys filed a motion seeking to have Mayme Foster, the appellee, appointed guardian ad litem for Oscar Foster. On September 29, 1972 the court entered an order adjudicating Foster an incompetent. Thus he could not testify at the trial, and did not appear in court. The court proceeded first with the trial of liability issues and at the end of that aspect of the case entered a directed verdict that the unseaworthiness of defendant's vessel caused the accident in which Oscar Foster fell into a cargo hold. The liability determination is not challenged on this appeal. The trial then proceeded on the issue of damages.

It was plaintiff's theory that Foster was suffering from severe schizophrenia, and that his fall into the cargo hold on defendant's vessel was a "triggering mechanism" which resulted in that psychotic condition. In support of that theory the plaintiff offered the testimony of Dr. Harold Dillon, Chief of Psychiatry at the University of Pennsylvania Division of the Philadelphia General Hospital, who had treated Oscar Foster between January 22, 1969 and the date of the trial, and who in answer to a hypothetical question expressed the opinion based on reasonable medical certainty that the fall was a triggering mechanism for Foster's psychiatric condition. There was contrary expert opinion testimony as to the connection between the fall and the schizophrenia by Dr. Joseph Robinson, an Assistant Professor of Psychiatry at Hahnemann Medical College, who examined Foster on behalf of the defendant. Dr. Dillon's testimony as to prognosis suggested that there was progressive deterioration which would continue, that Foster would never be gainfully employed, that he would need hospitalization for at least one month a year for the rest of his life and that he would require monthly visits to a psychiatrist. As might be expected, Dr. Robinson's testimony as to prognosis was considerably more optimistic, suggesting the likelihood of periodic remission. There was evidence establishing a life expectancy of 37 years and a work expectancy of 30 years. The amount of damages was clearly related to Foster's present condition and prognosis. The verdict is for $500,000.

On the evening of the second day of the trial an attorney for the plaintiff, without notice to the court or to opposing counsel, went to Oscar Foster's home with a videotape crew which recorded a two-minute segment showing the attorney interrogating Foster. We have viewed the segment of videotape. It shows Foster to be in an apparently uncommunicative and partially catatonic state, responding to interrogation with grunts and growls. The tape discloses none of the circumstances surrounding its preparation and discloses nothing about Foster's state immediately before or after the intrusion by the video crew. The defendant objected to showing the tape to the jury:

"MR. KELLY: Your Honor, I would object to the admission of that tape. I have just learned about it just now. It's highly prejudicial to the defense inasmuch as we are not familiar with the circumstances surrounding the taking of the tape.

We were not afforded an opportunity to be there, which we could have been. Therefore, under all those circumstances, and the late appearance of this tape, although taken last night, the defense objects to its admission.

.    .    .    .    .    .

THE COURT: What is the purpose that you are introducing this?

MR. BARISH: I am introducing this strictly to be illustrative of Dr. Dillon's testimony. It has no greater purpose than a chart that a doctor would use to talk about in his testimony. It has no greater purpose than a schedule to know what a doctor would

use to explain a broken bone, and Dr. Dillon was to state what this gentleman is like, and this is illustrative of his present condition.

MR. KELLY: Your Honor, the difference between a chart—a skeleton and that tape is obvious and apparent. That tape is inflammatory to the jury.

Dr. Dillon is in a position just as any doctor is in any case to testify from his notes, through his medical expertise as to the condition of Mr. Foster.

If the only purpose for that tape is illustration, I consider that the prejudicial fact was involved in the jury seeing that tape are—they far outweigh any importance of illustration.

. . . . . .

THE COURT: Doctor, is this the first time you have seen this tape?

THE WITNESS [Dr. Dillon]: I saw it at one time today.

THE COURT: Is that illustrative of what you would testify to? Have you seen him in a condition like this?

THE WITNESS: No sir. I saw him last [S]aturday afternoon at his home at which time he was totally mute and catatonic. He was not making the grunting, growling and snarling things at the time I saw him.

. . . . . .

THE COURT: I don't think it will inflame anybody. I don't know that it will prejudice anybody, but I am trying to figure out for what purpose it is being introduced if this doctor had never had a chance to observe him in that condition. I thought that was backing up his position.

Mr. Barish: . . .

I think the jury may have some question as to what he is really like, and I think that that weighs heavily in favor of showing it to the jury because they have never seen Mr. Foster." (48A–51A)

■■■ The videotape was shown to the jury. Plaintiff offers several justifications for admission. First it is urged that because the defendant did not insist upon production of the video crew to authenticate the tape, he waived any other objection. This contention misstates the record. Next, she urges that the videotape was admissible in connection with Dr. Dillon's testimony as a fair representation of the condition for which he was treating Foster. *See, e.g.,* Jenkins v. Associated Transport, Inc., 330 F.2d 706, 711 (6th Cir. 1964). But Dr. Dillon's testimony was that the videotape was not a fair representation of the condition in which he saw Foster. Moreover the videotape has a communicative content other than merely pictorial. Undoubtedly hearsay communications to a physician for the purpose of obtaining treatment, and possibly videotape and motion picture recordings of those communications, are admissible as exceptions to the hearsay rule on the theory that the need for accurate diagnosis and treatment and the opportunity to cross examine the physician afford appropriate hearsay safeguards. But that rule is inapplicable to ex parte communications prepared outside the presence of a treating physician for use as testimony. Plaintiff now urges that the tape qualifies as admissible hearsay on the theory that all conduct is admissible to establish insanity. *See* 2 J. Wigmore, Wigmore on Evidence § 228 (3d ed. 1940). We need not here consider whether an ex parte staged demonstration, rather than testimony respecting observations of the everyday conduct of the allegedly insane person, qualifies as evidence of irrational conduct. The plain fact is that Foster was an adjudicated incompetent. His insanity was not in issue. The issue was the extent of his disability and his prognosis. Finally plaintiff urges that the videotape was admissible, as would be an anatomical chart or a skeleton, to illustrate Dr. Dillon's testimony. That is not the use to which it was put. Plaintiff's attorney offered the videotape to establish Foster's condition, referred to Foster's grunting and groaning in summation in

support of an award for pain and suffering, and referred to the videotape as establishing permanent disability. But even if its use had been so restricted, any benefit which might have been derived in the factfinding process by such an illustration was far outweighed by the prejudice of admitting what amounted to ex parte testimony from the absent incompetent. The ruling admitting the videotape was error.

In addition to its objection to the use of the videotape, the defendant advanced in support of its motion for a new trial the refusal of the trial court to grant a mistrial based on the closing remarks of counsel. The following are typical:

"I would also like to point out to you that, with the size, assets and resources of the company that Mr. Kelly represents, if there were, in fact, one witness who could have contradicted the evidence of Mr. Foster's prior good condition, they would have found him; . . . ." (145A)

"Did they, with all of their resources, with all of their ability to go out and find people and do things, did they come into this courtroom with any factual witness? No. What did they do? They brought in Mr. Penn." (152A)

"Now, ladies and gentlemen, you are the collective conscience of this community. You represent not only yourselves; you represent this entire community; and it's up to you, ladies and gentlemen, to say whether one of these foreign steamship companies is going to come into our port and ruin one of our citizens and then, instead of coming in and saying it was our fault, bring in a phony witness like Mr. Penn instead of saying sure, this was the cause of this, and bring in a phony witness like Doctor Robinson." (158A)

"I say, ladies and gentlemen, you are the collective conscience of this community, and I ask that you let the word go out from this courtroom that, when these foreign operators come into this port and destroy one of our citizens, that you are not going to tolerate the kind of shenanigans that went on in this case." (159A).

" . . . [T]here is something wrong when the damage that they did has to be paid for by the taxpayers of the state, and so Mr. Foster, not only because he should have the best treatment or reasonably best treatment, but because, you, each of you, don't have to share the responsibility for what they did, he is entitled to be treated in private hospitals." (166A)

"Ladies and gentlemen, you saw him grunting and groaning. It's been said that a human being made in God's image is second only to the angels. And what do they do? They turned this human being into someone who acts like an animal, and the tragedy is that, after they did it, then they come in with Mr. Penn and Doctor Robinson and try to fake you out." (169A).

■ In support of the foregoing argument the plaintiff relies on Domeracki v. Humble Oil & Refining Co., 443 F.2d 1245, 1248 (3d Cir.), cert. denied, 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971), in which we refused to set aside a verdict on the basis of an oblique reference to the financial resources of the defendant Humble Oil, to which no timely objection was made. That reliance is misplaced. We did not suggest in *Domeracki* that we sanctioned appeals to juror prejudice by virtue of disparity of financial resources, by virtue of foreign ownership of the vessel, or by none too subtle suggestions that if the defendant did not pay substantial damages plaintiff would be a burden on the community. The quoted remarks were improper summation and were not, on this record, cured by the court's instruction.[1]

---

1. The court instructed:
"This case should be considered and decided by you as an action between persons of equal standing in the community, equal worth in holding the same or similar positions in life. A corporation is entitled the

Judging the two errors to which we have referred in the light of the entire record, we conclude that the refusal of the district court to grant a new trial was inconsistent with substantial justice. Fed.R.Civ.P. 61. We reach this conclusion reluctantly, since the death of Oscar Foster after the first trial has altered the situation of the parties. Nevertheless, on this record the defendant is entitled to a new trial on damages.

The judgment of the district court will be reversed and the case remanded for a new trial on damages.

same fair trial at your hands as a private individual. All persons, including corporations, stand equal before the law and are

to be dealt with as equals in a court of justice." (14A).