Arthur H. **PITCHFORD** and **Pitchford Scientific Instruments Corporation**

v.

**PEPI, INC., et al., Appellants.**

**Nos. 75–1136 and 75–1137.**

United States Court of Appeals, Third Circuit.

Argued Sept. 4, 1975.

Decided Dec. 24, 1975.

As Amended Feb. 6, 1976.

Certiorari Denied June 14, 1976.

See 96 S.Ct. 2649.

corporation itself, brought an antitrust suit alleging that the practices of a manufacturer had illegally restricted their business opportunities and ultimately resulted in the termination of the dealership, causing damages to both the corporation and its president.[1] After trial before a jury, a verdict for $825,000 was returned which was trebled by the trial court, and an attorney's fee was awarded.

The manufacturer brings this appeal, asserting a series of contentions concerning the standing of the officer to sue, the proof of liability for the various antitrust violations set forth, the conduct of the trial, and the appropriate measure of damages in the event that liability was properly found. The manufacturer also complains about the amount of the attorney's fee that was awarded and about the absence of an adequate explanation for such fee.

## I. BACKGROUND OF THE SUIT.

Pitchford Scientific Instruments Corporation (Pitchford Scientific), a Pennsylvania corporation, and Arthur H. Pitchford, president and holder of all but one per cent of the stock of Pitchford Scientific, are the plaintiffs in this action. Mr. Pitchford and Pitchford Scientific will both be referred to as Pitchford, except where necessary to distinguish their separate claims. The defendants are North American Philips Corporation (NAP), Philips Electronic Instruments (PEI), and Philips Electronics & Pharmaceutical Industries (PEPI).[2] All the defendants will be referred to as PEI.

PEI markets three lines of sophisticated electronic instruments for industrial and scientific use: scientific and analytical, industrial, and medical. The alleged antitrust violations arose from Pitchford's handling of the scientific-analytical and industrial lines under an annual dealership contract with PEI. The dealership contract

Paul H. Titus, Bernard D. Marcus, Jon Hogue, Kaufman & Harris, Pittsburgh, Pa., for appellants.

Clayton A. Sweeney, Gregory A. Pearson, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellees.

Before VAN DUSEN, ADAMS and HUNTER, Circuit Judges.

### OPINION OF THE COURT

ADAMS, Circuit Judge.

Plaintiffs, the president of a corporation that deals in scientific instruments and the

---

1. The causes of action were based on section 1 of the Sherman Act, 15 U.S.C. § 1 (1970), and section 3 of the Clayton Act, 15 U.S.C. § 14 (1970).

2. PEI is a division of NAP. At the beginning of this action, PEPI was a subsidiary of NAP, but since that time has merged into NAP.

contained a clause allowing PEI to cancel the arrangement at any time, upon thirty days' notice to Pitchford. PEI exercised this option, and the Pitchford dealership came to an end on September 10, 1970.

In its complaint, filed December 24, 1970, Pitchford claimed that PEI had violated both the Sherman and Clayton Acts by policies designed to implement price-fixing, exclusive dealing, full-line forcing, and territorial sales restraints. The plaintiffs asserted that such conduct caused injury to them while Pitchford Scientific acted as a dealer for PEI and, further, resulted in the eventual termination of the dealership.[3]

Trial began on February 26, 1974, and in response to special interrogatories a verdict against PEI was returned on March 29, 1974. The verdict of $825,000 was divided as follows: $550,000 was awarded to Pitchford Scientific for the counts dealing with price-fixing, full-line forcing, exclusive dealing, and territorial restrictions;[4] $72,000 was awarded Mr. Pitchford for substantially the same violations; and $203,000 was awarded Pitchford Scientific for damages resulting from the termination of the dealership. The $825,000 figure was trebled by the trial judge to $2,475,000.

On June 26, 1974, the court denied PEI's motions for a judgment notwithstanding the verdict and for a new trial. The court then awarded plaintiffs an attorney's fee in the amount of $645,250. On November 20, 1974, the trial judge denied PEI's motion for alteration of this award.

PEI appeals on six grounds:

1. It was entitled to a directed verdict because Mr. Pitchford lacked standing to sue as an individual, Pitchford failed to prove PEI's liability for price-fixing, exclusive dealing, full-line forcing, or territorial restraints, and there was no proof that the cancellation of the Pitchford dealership was related to any of the alleged antitrust violations.

2. In any event, PEI is entitled to a new trial because Pitchford introduced prejudicial material, improper hearsay, and inadmissible opinion evidence. In addition, PEI urges that a new trial is necessary since a considerable portion of the questioning by Pitchford's counsel regarding price-fixing was deliberately misleading and because Pitchford's counsel made improper remarks in his opening and closing arguments.

3. The evidence introduced by Pitchford on its lost profits and the value of the terminated dealership was improper.

4. The inclusion of the full-line forcing count in the special interrogatories to the jury was improper, since the count had been dismissed by the judge during the trial.

5. The charge was inadequate to guide the jury in properly applying the relevant law to the facts of the case.

6. The award of counsel fees was excessive and a proper predicate for such fees was not set forth.

In response, Pitchford contends that we should sustain the judgment based on the jury's verdict and uphold the award of attorney's fees.

We affirm in part, reverse in part, vacate in part, and remand.

## II. MR. PITCHFORD'S STANDING TO SUE.

At trial Mr. Pitchford claimed that he was entitled to damages, because of income that he had lost as a result of the various restraints by PEI on Pitchford Scientific. Mr. Pitchford also sought to recover the salary he lost as president of another firm, not a party to this action, Pitchford Manufacturing. It was alleged that from 1962 to 1968 PEI obstructed the development by Pitchford Manufacturing of Portaspec, a product Mr. Pitchford was eager to place on the market. In addition to the award to Pitchford Scientific, the jury awarded $72,000 to Mr. Pitchford for his personal claims.

---

3. Pitchford also alleged fraud and unconscionability with regard to the dealership agreement and its termination. The trial court entered a separate order granting a directed verdict to

PEI on these counts, and that order has not been appealed.

4. There was no specific allocation among these counts.

On appeal, Mr. Pitchford contends that, even without considering the Portaspec issue, he would be justified in recovering an amount "at least equal to his average annual earnings of $57,000 per year between 1967 and 1970." Mr. Pitchford does not point to anything in the record to justify this particular measure of damages.

PEI, however, asserts that Mr. Pitchford had no standing to sue and that, consequently, the jury award to Mr. Pitchford as an individual was improper. Since the record indicates that PEI's business was conducted with Pitchford Scientific and not with Mr. Pitchford personally, any injury under the alleged violations, PEI argues, was suffered by that corporation alone.

There is no proof that any of the restraints were directed against Mr. Pitchford individually as a shareholder or as an officer of either Pitchford Scientific or Pitchford Manufacturing. Consequently, any harm to Mr. Pitchford would have to flow derivatively from injuries done the companies of which he was a shareholder and an officer.[5]

This Court has adopted the precept that "the language [in section 4 of the Clayton Act] does not include indirect harm that the individual may [have suffered] as a stockholder through injury inflicted upon the corporation."[6] As this Court noted as early as 1910:

Certainly it is not apparent that [the Sherman Act] was intended to or did confer upon hundreds of thousands of stockholders individual rights of action when the wrongs could have been equally well and more economically be redressed by a single unit in the name of the corporation.[7]

Hence, Mr. Pitchford in his capacity as shareholder is without standing.

A denial of standing applies with equal force to Mr. Pitchford in his status as an officer of Pitchford Scientific.[8] Mr. Pitchford alleged that his salary as president of the firm was less than it would have been had the firm been able to market electronic instruments free of the restrictions imposed by PEI. Mr. Pitchford cannot, however, obtain standing merely by shifting profit from his shareholder pocket to his officer pocket.

Moreover, salaries of corporate officers are not necessarily tied to corporate profits; other factors may weigh in the balance. To permit suits by officers for salaries lost in consequence of antitrust violations on the basis of facts such as were presented here would open the door to conjectural damage claims. Mere assertion of a relation between a corporation's losses and its officers' salaries without more does not provide the foundation necessary to establish standing to sue. If his salary as president is not simply the reverse side of his earnings as principal shareholder of the company, any reduction in his salary attributable to PEI's practices is too far removed along the causal chain to entitle Mr. Pitchford to standing.

The same reasoning applies to Mr. Pitchford's standing as an officer of Pitchford Manufacturing. While the corporation might have a cause of action on the basis of the facts alleged here, the corporation's president can have no standing to sue in these circumstances.

---

**5.** Even if standing to sue were not questioned here, the record does not appear to contain evidence sufficient to show that PEI's alleged exclusive dealing practices obstructed the development of Portaspec during the damage period. Indeed, Mr. Pitchford conceded that early in George Crosby's tenure as General Manager of PEI, which began in 1966, PEI approved the development of Portaspec.

**6.** *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732–34 (3d Cir. 1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971);

*Ash v. International Bus. Mach. Corp.*, 353 F.2d 491 (3d Cir. 1965), *cert. denied*, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966).

**7.** *Loeb v. Eastman Kodak Co.*, 183 F. 704, 709 (3d Cir. 1910).

**8.** *See Vermilion Foam Products v. General Electric Co.*, 386 F.Supp. 255 (E.D.Mich.1974) (dictum). *Cf. Harrison v. Paramount Pictures, Inc.*, 115 F.Supp. 312, 316 (E.D.Pa.1953), *aff'd per curiam*, 211 F.2d 405 (3d Cir. 1954).

Accordingly, based on the facts present in this suit, Mr. Pitchford is without standing to sue as an individual, and all portions of the judgment granting recovery to Mr. Pitchford personally must be reversed.

## III. PRICING POLICY.

PEI's pricing policy was formulated by a committee consisting of its director of marketing, its chief financial officer, and its general manager. The committee promulgated a price list for sales of PEI's product to the public by its dealers and company-owned branch outlets, and a code indicating a discount at which the dealers could purchase the equipment from PEI. If, for a particular transaction, a dealer considered that the specified discount was not sufficient to make the sale profitable, the dealer could request a sales allowance beyond the normal discount.

Publishing list prices and establishing a program under which dealers may obtain extra discount, PEI argues, is perfectly proper. Mr. Pitchford, however, testified that PEI not only issued a suggested list price, but also exercised extensive control over prices. Any variance by a dealer from the list price, Mr. Pitchford stated, required approval by the pricing committee. Mr. Pitchford's testimony was supported by a PEI document, mailed to dealers and branches in 1969, which stated that any deviation by the dealer from the list price was to be approved by at least one member of the pricing committee.

There was evidence that PEI enforced its pricing policy. In connection with a sale to the Magee-Women's Hospital in 1969, Pitchford requested permission to sell below PEI's listed price. According to Mr. Pitchford, PEI's director of marketing, Robert Deichert, was "very emphatic that under no circumstances could [Pitchford] cut the price." Deichert finally agreed that Pitchford would sell at list, and then make a separate grant to the hospital. PEI proceeded quietly to pay Pitchford a portion of the grant. Although Pitchford was not permitted to sell a line of Pye Unicam equipment at less than list price, a subsequent sale of such equipment to the Magee-Women's Hospital was consummated when Pitchford agreed to supply the hospital certain spare parts at no cost.

Sufficient evidence was presented to support a finding by the jury that PEI's pricing policies constituted a violation of section 1 of the Sherman Act. If there is no applicable fair trade legislation, resale price maintenance is *per se* illegal.[9] The only way a supplier such as PEI may permissibly influence resale prices is by an announcement of its preferred retail pricing policy. A supplier may not go beyond such an announcement to control the retail pricing practices of those to whom it passes dominion and control over its goods.[10]

The memorandum defining the role of PEI's pricing committee indicates that the committee's purpose was not only to supervise branch sale prices but to supervise dealer sale prices as well. The pricing committee policed both branch and dealer practices in the same manner, and PEI's intention with respect to the Magee-Women's Hospital sales could reasonably have been perceived to be that any Pitchford price concession not undermine PEI's list price policy. Accordingly, there was enough evidence for the jury to find the intent requisite to the antitrust violation.[11]

A plaintiff, however, must demonstrate both that the antitrust laws were violated and that it has suffered "fact of damage" in consequence of that violation in order to establish a cause of action in a

---

9. *Kiefer-Stewart Company v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1950). There is no evidence in the record that PEI's equipment came under any fair trade legislation.

10. *United States v. Parke Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); Von Kalinowski, Antitrust Laws and Trade Regulation § 67.02(2) (1972).

11. *Compare Rea v. Ford Motor Co.*, 497 F.2d 577, 590 (3d Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974).

private antitrust suit.[12] There is not enough evidence here to sustain the jury's finding that during the four-year statutory damage period [13] there was damage from such a violation.

As the Supreme Court stated in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, "the burden of proving fact of damage under section § 4 of the Clayton Act is satisfied by proof of some damage flowing from the unlawful conspiracy . . . ." [14] It would have been sufficient if the wrongful acts had a tendency to injure Pitchford's business and if there had been introduced evidence of a decline in the value of Pitchford's profits that was not shown to be attributable to causes other than the antitrust violation. Pitchford, however, conformed to PEI's policies and there was no evidence relating the termination of the Pitchford dealership to any price-fixing plan of PEI. Nor was there sufficient evidence that Pitchford lost net profits because of PEI's pricing policies.

Accordingly, Pitchford failed to sustain its burden of proving fact of damage with respect to the price-fixing cause of action, and the trial judge improperly denied PEI's motion for judgment notwithstanding the verdict on this count.

## IV. EXCLUSIVE DEALING.

Although there is evidence that Pitchford lost sales prior to the damage period as a result of PEI's exclusive dealing practices, the evidence of injury to Pitchford in this respect during the damage period is ambiguous at best.

The most critical evidence in this regard is the following: Chester Robards, a Cleveland PEI dealer who was terminated, testified that he had been told sometime after 1967 that PEI was beginning to carry a line of equipment that would compete with a line he already carried, and that he was advised by PEI to give up the competing line. In June 1969, PEI executed a dealership agreement with VWR, PEI's West Coast dealer, providing that the handling of competing lines by VWR during the period of the agreement would be ground for termination. Also, Pitchford introduced a deposition of John O'Connor, director of marketing at PEI until 1968; O'Connor indicated that PEI had no policy with respect to its dealers representing companies aside from PEI, "other than the obvious conflict of interest type understandings . . . we wouldn't tolerate them representing a competitor." Thus, there is evidence that the policy of not permitting PEI dealers to represent a competitor was in effect for at least a portion of the damage period.

A memorandum dated November 1969, from George Crosby, the General Manager of PEI, to Robert Cavanaugh, the Vice President of PEI, concerning Pitchford's handling of a medical line supplied by another division of NAP. Crosby wrote:

> While our dealers are independent businessmen . . ., the facts are that they are essentially salesmen with one year contracts and we should demand the same performance from them that we do from our own sales force. I would fire one of my own salesmen if he casually announced that he were distributing other product lines, but in the past we have assumed there is nothing wrong with a dealer announcing to us that he now represents other companies (e. g., Pitchford taking on the medical x-ray line). I have told our dealers [we] don't care how they run their business, as long as their performance continues to be acceptable for PEI . . . but when performance deteriorates, we feel an obligation to get into the details of their activities just as we do in the case of a PEI salesman with a deteriorating performance. . . . It is very obvious that Arthur wants us to

---

12. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 113–14, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Rea v. Ford Motor Co.*, 497 F.2d at 589.

13. 15 U.S.C. § 15b (1970). In the present case this period began on December 24, 1966 and ended on December 24, 1970.

14. 395 U.S. at 114 n. 9, 89 S.Ct. at 1571.

get off his back . . . I doubt very much that this latest flareup will result in our terminating Arthur Pitchford as a dealer but I would like to make known to him that the decision to terminate the dealer-relationship . . . is based upon poor performance.

■ There was no direct evidence that PEI enforced an exclusive dealing policy that prevented Pitchford from taking on competing lines of equipment during the damage period. The Crosby-Cavanaugh memorandum indicates merely that Crosby had a predilection to treat dealers in a fashion similar to branch salesmen. Pitchford's evidence about opportunities relinquished prior to the damage period is useful to establish a pattern of violation. There is some validity to Pitchford's argument that PEI's attitude about exclusive dealing prior to the damage period and its exclusive dealing approach to other dealers made it clear to Pitchford that the assumption of competing lines was futile.[15]

The evidence of injury to Pitchford because of PEI's alleged policy of exclusive dealing was, however, insufficient. Indeed, Mr. Pitchford testified that he could not cite any examples of sales that were missed because of exclusive dealing practices by PEI during the damage period.

Pitchford's failure to prove any lost opportunity within the damage period is fatal to its claim on this count, because a plaintiff may not succeed in a private antitrust cause of action unless it shows fact of damage.[16]

## V. FULL-LINE FORCING.

Mr. Pitchford testified that during the damage period his organization was coerced into taking on the Pye Unicam line and the Torr X–Ray unit. He stated that, because of its poor quality and lack of profitability, he did not want to sell the Pye Unicam items. Two other employees of Pitchford also testified to the reluctance of Pitchford to distribute the Pye Unicam line. However, Mr. Pitchford stated that he was "afraid not to take on the line" for fear of cancellation of his dealership agreement.

To demonstrate injury by the forcing of the Pye Unicam products, Pitchford introduced evidence that it spent $15,814 for the initial equipment, approximately $1,400 for a trailer to haul the equipment, and $5,000 to pull the trailer. Pitchford also adduced testimony that it needed a full-time salesman to sell Pye Unicam equipment in 1968, and that in 1969 time equivalent to that which one salesman would provide was expended marketing this item. The orders booked in a year by these efforts to sell the Pye Unicam equipment were approximately one-seventh of those of an average Pitchford salesman.

The Torr unit was also undesirable, according to Mr. Pitchford, because he felt a competitor of PEI made a better, lower-priced X-ray. Robards testified that all PEI dealers were informed that "they were expected to buy one of [the Torr units]." Presumably the purchase of a demonstration unit was preparatory to marketing the unit for PEI.

■ Full-line forcing is a violation of the antitrust laws only if the effect of such forcing "may be to substantially lessen competition . . . in any line of commerce."[17] In order to establish such a transgression, it must be shown that the seller had economic power in the market for the forcing item and that a substantial

---

15. Pitchford did not show the mischief that any PEI exclusive dealing practices might inflict on commerce. PEI accounted for 25 to 40 per cent of the total United States market in each of its product lines and thus occupied a powerful economic position, but there was no evidence about which lines of commerce were substantially affected by Pitchford's inability to handle them. Under section 3 of the Clayton Act, exclusive dealing arrangements are illegal only if they foreclose competition in a substantial share of a line of commerce. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

16. *See* note 12 *supra* and accompanying text.

17. 15 U.S.C. § 14 (1970).

amount of commerce relating to the forced item was foreclosed.[18]

In *Fortner Enterprises, Inc. v. U. S. Steel Corp.*, a tying case, the Supreme Court indicated that the seller's economic power need not be a "monopoly or even a dominant position" in the market for the tying or forcing product; economic power would be sufficient for proof of a violation if the seller imposed the restraint "with respect to any appreciable number of buyers. . ."[19] With regard to the amount of commerce in the forced product that must be foreclosed in order to prove a violation, the Court in *Fortner* decided that $200,000 was not an "insubstantial" amount of commerce.[20]

■ Although Pitchford produced evidence of forcing by PEI with regard to the Pye Unicam and Torr equipment and although Pitchford's expenditures in connection with this equipment constitute the necessary fact of damage, Pitchford adduced no evidence that PEI's full-line forcing practices had any substantial effect on competition in any line of commerce. Regardless of the manufacturer's economic power, there can be no liability under a full-line forcing count absent a showing of foreclosure of competition in a substantial amount of commerce under the rule in *Northern Pacific*.

The trial judge appears to have agreed with this evaluation of the evidence, because near the conclusion of the trial he granted PEI's motion for a dismissal of this cause of action. Nonetheless the full-line forcing issue was included in the special interrogatories to the jury,[21] which returned a verdict that may have been based in part

on this count. Since there had been a failure to prove an essential element of this claim, however, there was no foundation for submission of the question to the jury.

Accordingly, that portion of the judgment based on the jury's verdict with respect to full-line forcing will be reversed.

## VI. TERRITORIAL RESTRICTIONS.

### A. *Factual Background.*

PEI chose Pitchford in 1945 to be its first dealer in the United States. Pitchford's office was in Pittsburgh, Pennsylvania, but PEI originally authorized Pitchford to sell anywhere in the United States. Beginning in 1955, however, territorial clauses were inserted in Pitchford's annual dealership agreements. These clauses explicitly precluded Pitchford from selling outside the specified territory. PEI agreed not to assign more dealers to the designated territory, but it reserved the right to deal directly with federal and state governments and national business accounts within the assigned territory. Pitchford was to receive full commission credit for sales by PEI to such government or business accounts. Over a period of time, Pitchford's territory was steadily reduced by PEI, despite attempts by Pitchford to have it enlarged.

In the late 1960's, PEI re-evaluated its distribution system and gradually replaced dealerships in particular territories with branches; these branches were part of the PEI organization. As a result, dealerships in the District of Columbia, Ohio, Illinois, and California were eliminated. Pitchford was terminated in 1970, and by the conclu-

---

18. *See Northern Pacific R. Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Fortner Enterprises, Inc. v. U. S. Steel Corp.*, 394 U.S. 495, 498–99, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

19. 394 U.S. at 502–04, 89 S.Ct. at 1259.

20. *Id.* at 502, 89 S.Ct. at 1252.

21. The full-line forcing count was left in an ambiguous procedural status. After the court "tentatively [sustained]" PEI's motion to dismiss the full-line forcing count, a notation that the count had been dismissed was entered in the docket. Nonetheless, the full-line forcing count was submitted to the jury in special interrogatories and in the judge's charge to the jury, despite the docket entry and despite references by the trial judge and Pitchford's counsel during the discussion of the jury charge indicating that it was understood that the full-line forcing count had been dropped. Because we reverse the judgment based on the full-line forcing count on its merits, it is unnecessary to decide the procedural questions surrounding this count.

sion of the trial there were only two PEI dealerships remaining in the country.[22]

Under PEI's policy, sales by a dealer outside its territory diverted at least a portion of the sales commission to the dealership or branch that had jurisdiction over the area where the buyer was located. PEI intervened at the behest of various dealerships and branches to settle disputes over commissions and territories.

In addition, there appear in the record instances of the enforcement, just prior to and during the damage period, of PEI's policy to discourage all extraterritorial sales. Thus, Robards, president of the Cleveland dealership that was terminated, testified to a telegram sent by PEI approximately eight months prior to the beginning of the damage period. The telegram concerned the installation by Robards of equipment outside his territory:

> It is against Philips policy to have dealers contact prospects in other dealer territories without prior notification to dealer involved. . . . It is directly opposed to the Philips dealer franchise to accept orders for equipment to be installed in other dealer territories. . . . As a result full dealer discount and quota credit involved in aforementioned [sale] . . . will be assigned to . . . the [dealer in territory where buyer is located].

Pitchford contended that PEI's policy to discourage sales by a dealer outside its territory continued during the damage period.[23] In this regard, Pitchford introduced a letter sent by PEI in January, 1967 that threatened to terminate Robards' dealership because of sales made by Robards outside his territory.

A controversy erupted in 1969 between a branch salesman of PEI and VWR Scientific, the PEI West Coast dealer, over their competition for a sale of Pye Unicam equipment to a Texas college. The salesman's complaint prompted a letter from the sales manager, G. L. Dienes, to VWR:

> Phelan states he increasingly is running into [VWR] sales activity [in his territory]. . . .
> I am also attaching recent correspondence from Pye Unicam alleging [VWR] trying for Unicam business in Taiwan. Ted, this extra-curricular activity on the part of your sale representatives speaks well for their aggressiveness. *However, I would appreciate it if you would investigate these two situations and let me know what plans you have for eliminating this inter-competition in the future.* (emphasis supplied)

Deichert, PEI's director of marketing, received a copy of the Dienes letter, but raised no objection to the sentiments expressed in it.

In 1971, Dienes' successor sent another letter to VWR Scientific, questioning a sale by VWR in North Dakota, an area assigned to PEI's Chicago branch. A copy of this inquiry also passed over the desk of PEI's director of marketing without comment or correction.

Further, there is evidence that, in cases where a prospective customer asked for bids from various PEI dealerships in order to obtain the best price, PEI encouraged the dealers outside the territory of the customer to quote prices higher than the home dealer. A request for bids from an Hawaiian hospital was forwarded by PEI to its dealers around the country with this suggestive paragraph attached:

> [VWR, the home dealers] have been in continuing contact with [the hospital] and, of course are in a position to provide service in Hawaii. *We assume that other dealer organizations will be forced to quote additional monies for the travel expenses associated with installation of* [the equipment] *in the islands.* This is, of course, a matter of personal concern for individual dealer offices. (emphasis supplied.)

The evidence of enforcement of territorial restrictions against Pitchford itself dur-

---

**22.** Testimony that the move to direct branch selling is an industrywide trend was uncontradicted.

**23.** *See* note 13 *supra.*

ing the damage period is wholly circumstantial. In 1964, however, prior to the damage period, Pitchford was denied the commission on an order by a U. S. Steel plant in Gary, Indiana, which was outside Pitchford's territory. Evidence was presented about several other potential sales by Pitchford that were all thwarted by PEI's territorial policies, but these potential sales also appear to have arisen prior to the damage period.

Nonetheless, Pitchford claims that the Robards and VWR experiences reflected a continuing territorial allocation program by PEI. The President and General Manager of PEI, George Crosby, testified that the advent of his tenure in 1966 saw no change in PEI's territorial policies. Thus, urges Pitchford, the evidence supports the inference that the policies that prevented the Pitchford sales prior to the commencement of the damage period were still in force during the damage period.

PEI, however, insists that its territorial arrangement is reasonable, and exists primarily to assure proper installation and maintenance of its sophisticated and "hazardous" product. It asserts that no violation could be possible under the territorial restriction count "because of the critical importance of service and installation in the ability to successfully conduct business." Indeed, PEI maintains that Pitchford sustained a benefit from the territorial policy because Pitchford was under no compulsion from PEI to overextend its "meager" service staff by selling beyond its territory. PEI claims that the territorial limitation was so in keeping with Pitchford's capabilities that "in the last four or five years of its distributorship, 'Pitchford never made' any real efforts to make sales outside its territory." Finally, PEI contends that the Pitchford dealership profited from the territorial system because direct sales by PEI into the Pitchford territory generated full commissions for Pitchford, amounting to 21 per cent of its sales in 1969.

### B. *Violation.*

In *United States v. Arnold Schwinn & Co.,* a manufacturer's practice of restricting its dealers to sales in prescribed territories was held to constitute a vertical restraint and a *per se* violation of the Sherman Act.[24] The *Schwinn* rule forbids a manufacturer from enforcing restraints limiting a distributor's customers, either by geographic sales boundaries or otherwise, if the manufacturer has surrendered dominion and control over its product. Because there is evidence that Pitchford purchased PEI's goods for resale, the jury could properly have found that PEI had surrendered dominion and control to Pitchford.

Both prior to and during the damage period, PEI wrote to Robards, VWR, and other PEI dealers objecting to violations of PEI's territorial allocation. There was a termination threat to Robards during the damage period, at least partially attributable to his violation of PEI's territorial policy. PEI's termination of many dealers, its use of warnings to dealers, Pitchford's experience with PEI's territorial policy prior to the damage period, and the evidence that there was no change in PEI policy during the damage period, would enable a jury to find that PEI enforced its territorial policy during the damage period.

If a manufacturer cannot impose a vertical division of markets, neither can it police a division of markets for the benefit of horizontal competitors.[25] This Court in *American Motor Inns, Inc. v. Holiday Inns,* held that a chain of motels could not permissibly enforce territorial entry restrictions which gave existing franchisees a veto over the entry of any new franchises nearby.

**24.** 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). *See United States v. Topco Associates, Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Eastex Aviation, Inc. v. Sperry & Hutchinson Co.,* 522 F.2d 1299 (5th Cir. 1975).

**25.** *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230 (3d Cir. 1975). *See also Anderson v. American Automotive Assoc.,* 454 F.2d 1240, 1244, 1246 (9th Cir. 1972).

In the present case, there is evidence that PEI responded to branch and dealer complaints about sales made without regard to the territorial allocation and actively sought to prevent entry by one dealer into another dealer's territory. If an extra-territorial sale was consummated, the selling branch or dealer had to surrender all or a portion of its commission to the branch or dealer having jurisdiction over the customer's place of business. In addition, the record reveals an explicit agreement between PEI and each dealer to divide territories. Thus, a horizontal restraint, a *per se* violation of the Sherman Act, could be found on this record, even if the *Schwinn* prohibition of vertical restraints were not dispositive.

PEI seeks to avoid the impact of the *per se* rule against vertical and horizontal restraints by arguing, first, that the facts of this case show only a vertical restraint and second, that, because of the circumstances here, a court must apply a rule of reason analysis similar to that employed in *Tripoli Co. v. Wella Corp.*[26] In *Tripoli* this Court applied a rule of reason approach to limitations on distributor sales because the restrictions there were found necessary to prevent injury to inexpert users of professional hair care solutions. PEI argues that the restraints here were essential to assure customers of adequate service by the dealer who had sold them the instruments. But, unlike the situation in *Tripoli*, PEI has not offered any evidence to show that if PEI's territorial restraints were removed there would have been a danger of public injury similar to that suggested in *Tripoli.*

Nor does PEI, as it contends, come within the exception to the *per se* prohibitions found in *United States v. Jerrold Electronic Corp.*[27] In *Jerrold,* Judge Van Dusen, then a district court judge, found an exception to the *per se* rule prohibiting the tying of products and services when such tying is essential to the introduction of a new product under conditions of technological uncertainty. Judge Van Dusen characterized that case as a "rather unique situation." [28] In this case, which involved territorial restrictions rather than a product-service tying arrangement, PEI alleged that Pitchford was not providing adequate service. There was no evidence, however, that the territorial restraints employed by PEI were necessary to the initial success or failure of an industry with an uncertain and developing technology. Even assuming that the *Jerrold* exception applies equally to product-service tying and territorial limitations, no evidence was produced to sanction an exception to the *per se* rule in this case.

Here there is evidence of territorial restrictions imposed by the manufacturer, there is no basis for employing a rule of reason analysis, and the case does not fall within an exception to the general rule prohibiting territorial restraints by a manufacturer. Accordingly, the jury could properly have found a violation of section 1 of the Sherman Act.

## C. *Fact of Damage.*

In order to establish a cause of action for territorial restrictions, it must be demonstrated that there was an antitrust infraction and that the plaintiff has suffered "fact of damage" in consequence of that infraction.[29] Hence, Pitchford must show with "reasonable certainty" some injury to the dealership in consequence of the territorial restrictions imposed by PEI.[30]

**26.** 425 F.2d 932 (3d Cir. 1970).

**27.** 187 F.Supp. 545 (E.D.Pa.1960), *aff'd per curiam,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

**28.** *See Copper Liquor, Inc. v. Adolph Coors,* 506 F.2d 934, 944 (1975) (quality control rationale for imposing vertical territorial restraints insufficient to allow exception to *per se* rule).

**29.** *Rea v. Ford Motor Co.,* 497 F.2d 577, 589 (3d Cir.), *cert. denied,* 419 U.S. 868, 92 S.Ct. 126, 42 L.Ed.2d 106 (1974).

**30.** *Atlas Building Products Co. v. Diamond Block & Gravel Co.,* 269 F.2d 950, 958 (10th Cir. 1959), *cert. denied,* 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960). *See Story Parchment v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Deaktor v. Fox Grocery Co.,* 475 F.2d 1112, 1116–17 (3d Cir. 1973).

PEI is correct in noting that there was no presentation of a specific instance during the damage period when Pitchford lost sales or profits because of PEI's territorial policy. Pitchford introduced evidence, however, that (1) PEI was enforcing its territorial policy prior to and during the damage period, requiring commission reduction for extra-territorial sales and threatening the termination of at least one dealership because of violation of the policy; (2) Pitchford was denied three sale possibilities prior to the damage period because of PEI's territorial policies; (3) during the damage period Pitchford was required to sign an agreement with explicit territorial restrictions in order to continue its dealership; (4) Pitchford had the capability during the damage period to make sales beyond its assigned territory; and (5) from 1960 and into the damage period Pitchford had unsuccessfully attempted to have its territory expanded.

In addition, Pitchford produced witnesses and exhibits to show that, had it been permitted to compete in an expanded territory, it would have made additional sales, even considering competition from other PEI branches and dealers. After accounting for the costs and taxes that would necessarily accompany such an increased gross revenue, Pitchford would still have made an additional profit from the lost sales, according to the calculations of its witness.

This evidence was more than mere conjecture.[31] The jury might reasonably have concluded that PEI's policy of restricting dealers to limited territories had been applied directly to Pitchford during the damage period when PEI denied Pitchford's request that its territory be expanded. The jury might also have reasonably concluded that being confined to an assigned territory caused Pitchford to lose sales it might otherwise have made.

 It is not sufficient to show fact of damage by mere speculation or guesswork. But, in the circumstances of this case, it would be unduly harsh to require Pitchford to document each sale that it might have made had it contravened the PEI territorial policy and attempted to do business outside its restricted territory during the damage period. The jury could have credited the expert testimony adduced by Pitchford and could have found that Pitchford lost some profits by virtue of the loss of sales attributable to the territorial restrictions imposed on it by PEI.

Thus, it would have been inappropriate for the trial court to grant PEI's motion for a judgment n. o. v. with respect to the territorial restriction count. The disposition of this count, however, depends upon the resolution of PEI's assertions respecting trial error.

## VII. TRIAL ERRORS.

PEI raises a number of claims regarding conduct during the trial, the opening and closing arguments of counsel for Pitchford, and the charge to the jury. It was urged that these errors require that any portion of the case which survives PEI's motion for a judgment n. o. v. be reversed and remanded for a new trial. Therefore, these contentions would apply only with respect to liability for the territorial restriction cause of action, since all other issues of liability have been decided in favor of PEI, and since, as will appear below, the matter of damages must be remanded in any event.

The errors to which PEI objects fall into three categories. The first group concerns evidence. PEI alleges that testimony regarding activities in the 1940's and 1950's, substantially before the damage period, was irrelevant and likely to be confusing to the jury. This same objection is also made to evidence regarding the relations between PEI and various European corporations. In addition, Pitchford is alleged to have elicited hearsay and improper opinion testimony about the territorial restrictions on the dealership.

Arguments by Pitchford's counsel at the opening and close of the case are the basis for the second class of objections by PEI.

---

31. *Compare Deaktor v. Fox Grocery Co.*, 475 F.2d at 1116–17.

PEI avers that these arguments were prejudicial by reason of misstatements of fact, misstatements of law, reliance on matters not of record, allusions to nonproduction of witnesses despite the fact that the deposition testimony of such witnesses had been admitted into evidence, and appeals to passion. PEI is particularly concerned by a reference that compared PEI officials with Germans during the Nazi period, and by repeated employment of the image of small dealers beset by the unspecified nefarious practices of American industry.

The final class of objections relates to the charge to the jury. PEI contends that the instruction on territorial restrictions was erroneous and inadequate because it confused horizontal and vertical restraints and because it failed to consider all the elements of the offense. In addition, the charge is said to be incorrect since the jury was told that it could draw inferences from the nonproduction of evidence without instruction about witnesses whose testimony had been introduced by deposition. The charge also misled the jury by improperly comparing the antitrust laws to the tort of negligence and, PEI asserts, prejudiced the jury by a statement that "there is a strong human temptation to yield to the desires for profits" which often leads businessmen to "practices that happen to be illegal."

■ Although it goes without saying that great care must be exercised to assure that prejudicial and confusing evidence be eliminated or kept to a minimum, we cannot say that the admission of the evidence protested here rises to the level of reversible error. In a case of this nature, it is not irrelevant for the plaintiff to introduce evidence regarding the historic development of the alleged violations, although the plaintiff must show, of course, that there was a violation of the law within the statutory damage period. So far as the territorial restriction count is concerned, the evidence implicating PEI's European connections was included only incidentally in the context of evidence apposite to PEI's termination of the Pitchford dealership. The objections to hearsay and opinion evidence relating to the same count, although not lacking in merit, do not require reversal in the circumstances of this case. The evidence in question tended to reinforce Mr. Pitchford's testimony, but because his testimony was also corroborated in other ways the hearsay and opinion testimony may be regarded as primarily cumulative. In a long and complex case, such error does not constitute grounds for ordering a new trial.[32]

■ The opening and closing remarks by Pitchford's counsel may have from time to time approached the margins of impropriety. However, with respect to the territorial restriction count in particular, there are no improper references in the arguments that would merit the declaration of a mistrial. The general tone of the opening and closing arguments and the specific references to "Germany in 1941" and to "corporations that treat the law with utter and complete disrespect and disregard . . ." were immediately qualified with statements to the effect that "this is a far less heinous crime [than the attitude that prevailed in Germany in 1941], and I don't mean to imply in any way that they are comparable . . . ." and "the great bulk of [corporations] do everything they can to abide by the law. . . ." References to the criminal aspects of the antitrust laws were qualified by statements that the present case was a civil one.

Counsel ought not invoke horrors such as Nazi Germany, indulge in a polemic about large corporations generally when the issue is the behavior of one particular manufacturer, or allude in a civil suit to criminal laws that are in no way implicated in that action. We cannot say, however, that the arguments here, given their ambience, actually crossed the bounds of the impermissible.[33]

32. See United States v. Crescent Amusement Co., 323 U.S. 173, 189, 65 S.Ct. 254, 89 L.Ed. 160 (1944); Gerhart v. Henry Disston and Sons, Inc., 290 F.2d 778, 786 (3d Cir. 1961).

33. But compare Foster v. Crawford Shipping Co., 496 F.2d 788 (3d Cir. 1974); Robinson v. Pennsylvania Railroad Co., 214 F.2d 798 (3d Cir. 1954).

Nor does the charge to the jury require a reversal and remand for a new trial on the issue of liability with regard to the territorial restriction issue. Although the instructions regarding territorial restraints were not as adequately detailed as they might have been, these errors do not appear to be critical. This is so because of our determination that liability for a per se violation could be found in this case on either a vertical restraint theory or a horizontal restraint theory.[34]

The charge relating to the non-production of evidence was not unfair. Considered in its context, the charge would not suggest to the jurors that the failure to produce witnesses in person when their depositions had been offered in evidence is a foundation for an adverse inference. PEI cannot be said to have been prejudiced by the instruction on this matter.

Comparing antitrust law to negligence, while misleading, was not significant when the entire charge is considered, as it must be. The reference to "the strong human temptation to yield to the desires for profit" was included in a prolonged digression on the origins of the antitrust laws, and was not aimed with particularity at the defendants. In these circumstances it does not appear that this comment would unduly prejudice the jury.

Thus, there is no basis for granting a new trial with respect to the territorial restriction count. In view of this determination and the previous conclusion that it would be inappropriate to grant a judgment n. o. v. with respect to this count, the portion of the judgment based on the jury's finding of an antitrust violation and fact of damage under the territoriality count will be affirmed.

## VIII. MEASURE OF DAMAGES.

The jury found losses to Pitchford Scientific of $550,000 and $203,000—each amount being predicated on multiple violations of the antitrust laws. The special interrogatories did not require the jury to specify the amount of damages attributable to each violation. Because of our resolution that, as a matter of law, no liability was proved on the counts relating to price fixing, exclusive dealing, and full-line forcing, the question of damages in this case must be remanded for reconsideration. The only count on which the finding of liability has been affirmed is the territorial restriction count, and on remand damages solely with respect to that issue must be ascertained.

PEI, however, makes several objections to the methods of calculation of damages that were employed at the first trial. A number of these objections are relevant to the determination of damages stemming from the territorial restrictions, and we shall consider them in order that error may be avoided when damages are reconsidered on remand.

Pitchford attempted to estimate the additional profits it would have gained from an expanded territory, had it not been for the restriction and ultimate termination of its dealership. Pitchford's expert began by calculating Pitchford's share of all PEI sales in the United States. This figure was then applied to PEI orders-booked and sales in the expanded territory, including the states adjacent to Pitchford's restricted territory. An adjustment was made to account for competition from other PEI outlets in the projected area. The resultant figure was said to represent Pitchford's likely sales in the enlarged territory. From this hypothetical sales figure, the profits lost by Pitchford were computed.

PEI objects to this projection for two reasons. Initially, PEI contends that the expert's expansion of Pitchford's old territory was without foundation in the record. Instead, Pitchford's expert arbitrarily enlarged the territory to include all states adjacent to Pitchford's assigned territory, although there were already several PEI

---

**34.** *See* F.R.Civ.P. 61. *Cf. Williams v. Independent News Co.*, 485 F.2d 1099, 1106 (3d Cir. 1973).

branches and dealers in such states, and insufficient account was taken of the expanded staff that Pitchford would need to maintain its share of PEI sales in a larger territory.

Second, the calculation for the expanded territory produced a total profit for Pitchford sales in both its actual territory and in the hypothetical additional territory. According to PEI, the failure to deduct Pitchford's actual sales for the years 1967–1970 results in an overstated estimate of Pitchford's losses.

PEI also argues that in calculating incremental profits, Pitchford's experts used the sales and orders-booked figures inconsistently from year to year, that one of the orders-booked figures was grossly inaccurate, and that the figures used to compute Pitchford's lost profits are not representative of Pitchford's overall costs.

The next group of contentions focuses on the value of Pitchford Scientific at its termination. PEI asserts that there was no damage in fact to the going-concern value of the Pitchford dealership because termination by PEI did nothing to undermine the goodwill of the dealership which might have been continued by Pitchford with alternative product lines. Further, to the extent that goodwill was founded on dealing in PEI's equipment, any goodwill that Pitchford possessed must have been conditioned upon PEI's right to cancel under the annual dealership contract.

In this connection, PEI maintains that, even if Pitchford has been deprived of the goodwill value of its dealership, the calculation of the loss from that deprivation was incorrect. This is so because the salary of Mr. Pitchford was not included as a cost of operation of the dealership when potential earnings by Pitchford Scientific were projected. This omission artificially inflated earnings, it is contended, and resulted in an overstatement of projected profits. Moreover, PEI asserts that despite its objections the trial court permitted the use of calculations on the loss of going-concern value that were invalid for failure to exclude from such loss the assets retained by Pitchford at the termination of its PEI dealership. PEI objects also that there was no foundation for the capitalization rates used to compute the estimated going-concern value of the Pitchford dealership.[35]

PEI's final disagreement with the computation of post-termination damage is the use of the price paid for Pitchford's medical equipment business. The jury awarded Pitchford an amount that happened to be equal to the net value of its medical equipment business, as determined by its purchase agreement in 1972, in compensation for the termination of Pitchford's PEI dealership in 1970. PEI claims that the medical equipment business was not comparable to the dealership under consideration here, and that there is no evidence in the record that indicates any such similarity. Therefore, the value of the medical equipment business, maintains PEI, was irrelevant and misleading in estimating the value of the terminated dealership. More importantly, PEI charges that the valuation of the medical equipment business was grounded not on documents kept in the regular course of business, but on documents prepared *post litem motam.*

The contentions by PEI are not uniformly meritorious: PEI's challenge to Pitchford's expansion of its territory in the damage exhibit must fail. If the jury could reasonably have found that Pitchford was denied sales by virtue of PEI's territorial restrictions and that the dealership was terminated in connection with the illicit territorial policy of PEI, it could consider evidence estimating Pitchford's losses as a result of the PEI practices. There was evidence that Pitchford could have made sales beyond its territory; the extent of such hypothetical sales was necessarily an estimate. Whether the estimate of Pitchford's lost profits was overly generous—expanding Pitchford's territory beyond Pitchford's

---

35. The capitalization rates employed in three exhibits introduced by Pitchford ranged between 10% and 20%.

sales capacity—is a matter that concerns the weight of the evidence, not its admissibility. As such, it is a question for the jury to consider.

 In addition, PEI's claim that no goodwill was lost by Pitchford because of termination is without basis in the circumstances of this case. Pitchford could have built up substantial goodwill over the years while handling PEI products. That the annual dealership contract could be cancelled on thirty days' notice would not necessarily vitiate such goodwill and Pitchford, or its hypothetical purchaser, could have had a justifiable expectation that there would be no cancellation of the dealership in violation of the antitrust laws.

 A number of PEI's arguments, however, have substance. In particular, a plaintiff cannot recover its loss more than once. The salary of Mr. Pitchford should have been treated as a cost of operation in the data employed to project potential earnings for the purpose of evaluating the lost going-concern value of Pitchford.[36] The failure to deduct Mr. Pitchford's salary as an expense of the dealership artificially inflated earnings and made the profit extrapolation inaccurate. The same principle applies as well to any assets retained by Pitchford after termination; these assets should have been subtracted from the estimate of value lost in consequence of termination. Similarly, Pitchford may not recover, in the guise of estimated lost profits from hypothetical operations, profits that it had already earned within its accustomed territory.[37]

We do not decide the other issues raised by PEI with respect to damages, but on remand the district court should determine whether the medical supply business and the PEI dealership are reasonably comparable and, if they are, whether the profit figures of the Pitchford medical equipment business were based upon reasonably accurate business records. Only a similar business would provide a basis for a jury's consideration of damages on the termination count.[38]

In addition, every effort should be made to avoid inconsistent or inaccurate use of the sales and orders-booked figures. When considering the estimated, or *pro forma*, constructions of incremental sales from expanded territories, care should be taken that all reasonable costs of an expanded sales capacity are included and that competition from other PEI branches and dealers is properly weighed in the calculations.

## IX. THE AWARD OF ATTORNEY'S FEES.

Pitchford applied to the trial court for an award of an attorney's fee based on 3,270 hours devoted to the litigation by counsel and valued at $138,763.[39] Pitchford also sought expenses of $17,349. In a summary order the trial judge awarded $645,250 as an attorney's fee plus costs—over four times the sum set forth in Pitchford's application. In his order the trial judge cited

---

36. *Eastman Kodak v. Southern Photo Co.*, 273 U.S. 359, 376, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 n. 20 (3d Cir. 1975); *Ford Motor Co. v. Webster's Auto Sales, Inc.*, 361 F.2d 874, 886 (1st Cir. 1966); *Chiplets, Inc. v. June Dairy Products Co.*, 114 F.Supp. 129 (D.N.J.1950) (patent abuse).

Assuming that Mr. Pitchford earned the salary by the contribution of services necessary to the dealership's operations, anyone purchasing the dealership would have to expend an approximately equal amount to hire a replacement for Mr. Pitchford, and the earnings from ownership of the concern would have to be reduced by that much. If Mr. Pitchford did not contribute services equal in value to the "salary" he drew as president of the company, then

he was not being paid a salary but was drawing a dividend due the owner.

37. *Albrecht v. Herald Co.*, 452 F.2d 124 (8th Cir. 1971), *rev'd on other grounds*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Farmington Dowel Products Co. v. Forster Mfg. Co.*, 421 F.2d 61, 62 (1st Cir. 1970).

38. *Farmington Dowel Products Co. v. Forster Mfg. Co.*, 421 F.2d 61, 82 (1st Cir. 1970); *William Goldman Theatres, Inc. v. Loew's, Inc.*, 69 F.Supp. 103, 109 (E.D.Pa.1946), *aff'd*, 164 F.2d 1021 (3d Cir.), *cert. denied*, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948).

39. *See* 15 U.S.C. § 15 (1970).

*Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*,[40] but did not adduce any explanation for the amount of the award.

▮ The principles of *Lindy* are applicable to an award of attorney's fees pursuant to 15 U.S.C. § 15,[41] although *Lindy* itself involved an award under the equitable fund doctrine. The specific application of these principles in each case must be explained by the district court when it orders the award of attorney's fees. Because the explicit findings and analysis required by *Lindy* were not explicated, we are compelled to return the attorney's fee issue to the trial court.

▮ When considering this issue on remand, the trial court should be guided by the standards set forth in *Lindy*. It must take into account (1) the hours expended by counsel which contributed to the recovery; (2) the reasonable value of counsel's time, usually counsel's normal hourly billing rates; (3) the 'contingent nature of success' in the action, and (4) the quality of the work performed. The judge's evaluation of the quality of the services is to be made in light of what he has been able to observe, the amount of the recovery and the complexity of the issues in the controversy.[42]

The *Lindy* case involved a fee that was awarded from a fund which counsel had obtained for the benefit of a class. *Lindy* is, to that extent, different from the present suit, in which the award to Pitchford for the costs of its lawyers is to be paid by the defendant. An award from an equitable fund based on the "contingent nature of success" in the action would reflect somewhat the normal practice in contingency fee arrangements: Counsel is paid out of the damage award in a measure proportionate to the hazards of the case. Where

attorneys are paid from an equitable fund or by a contingency fee the defendant does not bear the cost incurred by the plaintiff in proceeding with the action, but under section 15 the antitrust defendant may be required to pay an award for attorney's fees as well as an award for damages.

*Merola v. Atlantic Richfield Co.*[43] applied the *Lindy* principles to a situation like the one presented here, since in *Merola* there was a specific agreement that the attorney's fee was to be fixed by the court and paid by the defendant. The opinion of Chief Judge Seitz in *Merola II* is instructive with respect to the application of the "contingent nature of success" concept, set forth in *Lindy*, to cases where the losing defendant must pay a reasonable fee for plaintiff's cost of counsel.

▮ This "contingent nature of success" factor, like the quality of work factor, is a consideration that provides the trial court with flexibility in its computation of the fee award.[44] The focus of the court's attention is to be the objective standard provided by the hours expended by counsel and the reasonable hourly rate of compensation for each attorney involved. The court may then justify deviation from the resultant figure if such is warranted by the success of the action despite a substantial likelihood of failure at the outset, or by the particularly high or low quality of counsel's work.

▮ The contingency fee agreement entered into by plaintiff and its counsel is distinct from the "contingent nature of success" concept as employed in *Merola II*. It would seem to be a questionable policy under 15 U.S.C. § 15 for courts to enforce against a defendant whatever contingency fee arrangements have been entered into by a plaintiff and its counsel,[45] because such a policy might encourage unrealistic agree-

---

**40.** 487 F.2d 161 (3d Cir. 1973).

**41.** *NBO Industries v. Brunswick Corp.*, 523 F.2d 262, 279 (3d Cir. 1975). *See Merola v. Atlantic Richfield Co.*, 493 F.2d 292, 298 (3d Cir. 1974).

**42.** 487 F.2d at 166–169.

**43.** 493 F.2d 292 (3d Cir. 1974) (*Merola I*), *on appeal from the decision on remand*, 515 F.2d 165 (3d Cir. 1975) (*Merola II*).

**44.** 515 F.2d at 168.

**45.** In this case Pitchford and his counsel had a 25 per cent contingency fee arrangement.

ments and result in excessive counsel fees. The opinion in *Merola II* indicates that this Court has not adopted a policy lacking sensitivity to this problem.

If plaintiff and its counsel have made a prior agreement respecting a contingency fee that would not be completely satisfied by the award of a reasonable attorney's fee pursuant to section 15, the unsatisfied portion of the contingency fee could then be paid out of the award for damages that has been obtained. It would appear improper to require a defendant to bear whatever costs its opponent's private arrangement would impose. Under 15 U.S.C. § 15 the defendant may be obliged to pay only what the court determines to be a reasonable fee for the legal services provided to plaintiff in the case at issue.[46]

## X. CONCLUSION.

The judgment of the district court will be affirmed in part, reversed in part, and vacated in part, as follows:

(a) That portion of the judgment based on the determination that Mr. Pitchford had standing will be reversed.

(b) That portion of the judgment based on the jury's verdict regarding the price fixing count will be reversed.

(c) That portion of the judgment based on the exclusive dealing verdict will be reversed.

(d) That portion of the judgment based on the full-line forcing verdict will be reversed.

(e) That portion of the judgment based on the jury's finding of an antitrust violation and fact of damage under the territoriality count will be affirmed.

(f) That portion of the judgment based on the jury's finding of amount of damage in connection with the territoriality count will be vacated and remanded for further consideration of damages.

(g) That portion of the judgment relating to the award of attorney's fee will be vacated and remanded for reconsideration and specific findings and analysis consonant with 15 U.S.C. § 15, *Lindy*, and the subsequent cases cited above.

The cause will be returned to the district court for further proceedings consistent with this opinion.

**46.** *See Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp.*, 194 F.2d 846, 859 (8th Cir.), *cert. denied*, 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952); *In re Gypsum Cases*, 386 F.Supp. 959, 984 (N.D.Cal.1974); *Gossner v. Cache Valley Dairy Ass'n*, 307 F.Supp. 1090 (D.Utah 1970).